THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARRYL THOMAS *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 83—1680, 83—1865 cons.

Opinion filed December 13, 1985.

James J. Doherty, Public Defender, of Chicago (Ira Churgin, Assistant Public Defender, of counsel), for appellant Darryl Thomas.

Steven Clark and Deborah Liebow, both of State Appellate Defender's Office, of Chicago, for appellant Wesley Robinson.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Mary Ellen Dienes, and Maureen O'Brien, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Following simultaneous trials, defendants Robinson and Thomas were convicted by the court and a jury, respectively, of murder and attempted armed robbery and each was sentenced to an extended term of 60 years for murder and a term of 15 years for attempted armed robbery to be served concurrently with the murder sentence. On appeal, Thomas contends that: (1) the trial court erred in denying his motion to suppress a statement made while in police custody; (2) the exclusion of jurors opposed to the death penalty after the denial of his pretrial motion to waive a jury for sentencing denied his (a) sixth amendment right to a representative jury and (b) right to equal

protection; (3) the prosecutor's use of peremptory challenges to exclude all black persons from the jury violated his sixth amendment right to a representative jury; (4) he was denied a fair trial by (a) certain objections made by counsel for Robinson which implied that Robinson disputed defendant's version of the occurrence; (b) evidence and argument regarding the victim's wife and children; and (c) testimony that the victim was a police officer; (5) he was improperly sentenced to an extended term for murder; and (6) he was denied a fair sentencing hearing where the prosecutor used his silence as evidence of his guilt of another crime. Robinson joins in Thomas' contention with respect to the impropriety of the extended-term sentence for murder and also contends that the trial court erred in refusing to suppress his statements.

THOMAS' MOTION TO SUPPRESS HIS STATEMENT

Defendant Thomas testified that on September 12, 1981, when the police came to his home they did not show him an arrest warrant or tell him there was one outstanding. They asked him to accompany them to their car which he did. He was not told that he was under arrest or that he could not leave. The officers asked him whether he knew what they wanted to talk to him about, but that is the only conversation they had in the car. He was taken to an interrogation room at the police station where, after being handcuffed to a ring on the wall, he was advised of his rights and questioned. He gave the officers a summary of his knowledge of the Weinschenk stabbing and then had a conversation with an assistant State's Attorney following which he gave a court-reported statement. Defendant stated on cross-examination that when the police came to the house, his sister was downstairs talking to them. They called him downstairs and asked whether he would walk to the car with them. They did not have their guns out nor did they handcuff him, and they agreed that his sister and mother could accompany him. He was not handcuffed nor advised of his rights while in the car.

Officer O'Connor testified that from other officers he learned that the victim said two black males were involved and that approximately six other people had observed two black males in their early twenties in the vicinity of the incident. Articles of clothing, two garment bags, a shoulder bag, and a piece of paper with three telephone numbers on it were found in an alley about 2½ blocks from the stabbing. Further investigation connected those numbers to defendant, who was not at home when O'Connor and another officer went there. They returned later and talked to his sister who told them that she had seen Robin-

son shortly after their earlier visit and when she told him that the police were looking for her brother, Robinson said, "I don't know why they are looking for Darryl, I stabbed the man." O'Connor testified also that he and the other officer had not entered the building and were still talking to defendant's sister when they were joined by defendant. He agreed to go with them to the station for an interview. While in the car defendant was advised of his *Miranda* rights, and while he was not told then that he was free to go, neither was he placed under arrest. Defendant's mother and sister went to the second-floor offices at the police station but were not present with him in the interview room. O'Connor did not remember whether defendant was handcuffed during the interview.

Officer Markham testified that defendant was not handcuffed in any manner when he was in the interview room nor was he searched or fingerprinted when he was brought into the station. On cross-examination, he stated that defendant agreed to tour the area with them and to go to the station. He gave defendant his *Miranda* rights when he got into the car but testified that he was not in custody at that time and was free to leave. There were no conversations in the car with him concerning the Weinschenk homicide, and at the station he was interviewed in a room with a glass window. Markham also said the use of an interview room did not indicate that the defendant was in custody because witnesses are always interviewed in those rooms. He was not handcuffed in that room and he made his statement as soon as he was asked what happened at the loop parking garage.

Tiola Phillips, defendant's mother, testified that it was Linda Parks, defendant's girlfriend, rather than his sister, Denice, who accompanied them to the police station. The officers did not handcuff defendant when they got into the police car but when they got out of the car at the station, his arms were handcuffed behind his back. He and the officers went to a room on the second floor and when the door opened she could see that defendant was sitting in a chair along a wall but she could not tell whether he was handcuffed at that time. The trial court denied the motion to suppress finding that defendant was not in custody when he gave the statement.

### ROBINSON'S MOTION TO SUPPRESS HIS STATEMENT

Officer Markham testified that he and his partner, Officer O'Connor, were at the violent crimes office when defendant Robinson came to the station with his attorney. In the presence of his attorney, Robinson was informed of his rights. He declined to make a statement and was placed in a holding room while the police tried to contact the

witnesses for a lineup. Robinson's attorney left after learning that lineup arrangements were being made. Markham had no further conversations with Robinson after he was placed in the interview room. On cross-examination, Markham stated that he did ask Robinson certain questions necessary in making out the arrest slip but he did not question him about the crime because Robinson declined to make a statement. He was not present when anyone else questioned Robinson about the crime and to his knowledge, his partner, Officer O'Connor, did not do so.

Officer Robertson testified that when he came on duty he made several telephone calls, but was not able to locate witnesses for Robinson's lineup. He did not speak to Robinson while he was on duty and, as far as he knew, none of the other officers talked to him regarding the Weinschenk homicide.

Officer O'Callaghan testified that, early in the afternoon of September 16, 1981, he brought Robinson to the second floor of the station and, after informing him that he was going to conduct some lineups, told him that he should notify his attorney and also advised him of his rights. Robinson said that he didn't think he had to call his lawyer; that he would cooperate and could probably straighten out the whole matter. Markham again explained Robinson's rights to him and after acknowledging that he understood them, Robinson said that he thought he could put the whole case together. Robinson then gave the following version of events:

> "He had some knowledge of the case because he had been sitting in a schoolyard on the west side talking to a friend of his named Darryl and to another guy. While they drank and smoked marijuana, Darryl and his friend talked about going downtown to rob some people and all three of them later rode an 'L' toward the loop with Darryl carrying a briefcase with tools and wire for hot-wiring cars. Robinson got off the 'L' at some point and the other two individuals continued on their way. Darryl told Robinson about the Weinschenk homicide that night and Robinson thought he could lead Officer O'Callaghan to the other party."

O'Callaghan and Officer Triggs then took Robinson to the alleys in the area of the homicide because Robinson said that he could help them find the murder weapon, the briefcase, and some other evidence. Based on information he said he had received from Thomas, Robinson directed the officers through certain alleys. The second alley was the same alley in which the police had obtained the clothing on the night of the homicide. They found nothing else and returned to

the station where lineups were conducted. Robinson then made another statement and later talked to an assistant State's Attorney. On cross-examination, O'Callaghan stated that he went to the lockup to get Robinson for the purpose of holding the lineup, not to obtain a statement from him and that without any questioning by him, Robinson simply began talking to him sometime in the early afternoon and the first lineup was not held until around 5 p.m. O'Callaghan was the only person present during Robinson's initial statement, and although he did not make any contemporaneous notes, he later typed a summation of the conversation in the police report. Robinson never told him that he would like to call his lawyer or have his lawyer present.

Stuart Palmer, an assistant State's Attorney, testified that Robinson initially told him that he didn't want to talk to the State's Attorney's office, stating that "I have already told my story to the detective and I told him the truth and the reason I don't want to talk to the states' attorneys' office is because I have to leave myself a fighting chance." Palmer did not have a chance to say anything to Robinson before he made the above comments, and he left immediately after the comments. He noticed nothing unusual about Robinson, nor did Robinson complain about his treatment.

Robinson testified that he went to the police station on September 14, 1981, accompanied by his attorney, who told Officer Markham that Robinson didn't want to make any statements. After Officer Markham advised him of his *Miranda* rights in the presence of his attorney, Robinson also said that he did not wish to make a statement. After his attorney left, Markham typed up his report and then went on to ask him some questions, but Robinson answered none concerning the murder. Markham's partner then came into the room, and after making him kneel with his hands behind his back, the two officers called him names, questioned his morals, and asked why he and Darryl killed the man. He told them again that he didn't want to talk to them. This questioning took place about 20 or 30 minutes after he was turned in by his attorney. Later that same night, Markham and two other detectives questioned him for several hours and detectives from a later shift made several unsuccessful attempts to question him about the case, but he again refused to talk when brought up from the lockup for questioning at around 9 a.m. and at 3 p.m. on September 15. Then on September 16, O'Callaghan suggested that he cooperate because Darryl Thomas said that he had killed the man. Robinson was in the room from around 9:30 a.m. on September 16 until about 10 p.m., and during this period O'Callaghan was in and out of the room and eventually told him that there would probably be a lineup

and that he would certainly be pointed out. Robinson then testified, "*** so I bested him, you know, what he wanted to hear, you know, my side of the story." Later, he said that he wanted to call his lawyer, but O'Callaghan continued questioning him and threatening him with a lineup. Robinson stated that he did eventually respond to the questions but he did not tell the truth. He gave the officers information because they were pressuring him and would not let him eat, sleep or call his attorney. A detective tried to bribe him with food by purchasing some chicken for Robinson around 12:30 p.m. on September 16, and attempting to exchange it for information. After he finished the chicken and indicated that he still did not want to talk, the detective said that Robinson had made a fool out of him and demanded that he tell them what he knew. When he asked for his attorney, the detective responded by threatening him with identification in a lineup and subsequent conviction if he didn't help himself by cooperating with the police. After Robinson still did not answer or give any information, the detective read Darryl Thomas' statement. Robinson told him that the statement was not true. Around 7 p.m. on September 16, he gave O'Callaghan information about the murder and robbery. He saw Assistant State's Attorney Palmer around 9:30 that evening in the interrogation room and told him that he didn't want to talk to him. On cross-examination, Robinson stated that Markham brought him up from the lockup for questioning for only a few minutes on the night of his arrest and that he was brought up by other officers for about a half hour at 1 a.m. Robinson stated that O'Callaghan did not say that he could not have the chicken unless he answered his questions and, although he did tell the State's Attorney that he had not slept, he did inform him that he had not been fed. He also stated that he was in a lineup around 4:30 or 5 that evening, or about a half hour after they returned from the alley, and that he was in two other lineups which followed shortly thereafter.

The trial court denied the motion to suppress finding that there was no coercion.

TRIAL TESTIMONY

Bridget Weinschenk testified she last saw her husband alive and well on the morning of September 10, 1981, and the next time she saw him was at the funeral parlor.

Kenneth Wallace testified that, on September 10, 1981, he and Darryl Thomas stopped to get Darryl's friend, Wesley, and the three then boarded an "L" train. He later got off the train, but Darryl and Wesley remained on. He identified a piece of the Sun-Times sports

section with his telephone number written on it and testified that he wrote his number on the paper and gave it to Darryl as he was getting off the train.

Michael Campbell testified that, on September 10, 1981, at approximately 8:30 p.m., when he took his break from his work at Continental Bank he went to his car at the Gateway parking lot at Monroe and Canal. He observed two black men at the corner of Canal and Monroe who were watching him. He continued on toward his car, which was facing Monroe, and noticed that, as they walked, one of the men kept turning back to look at him. One wore tan slacks and a brown jacket and carried a brown leather bag which kept falling off his shoulder as he turned around. The other wore jeans and a blue shirt.

Dwayne Bradford testified that on September 10, 1981, he parked his car in the basement of the Gateway parking lot. When he went to his car during a work break at 9:40 or 9:45 p.m., he saw two men coming from the parking lot to the elevator. One wore dark pants, and the other had on light pants. One also had a brown shoulder bag. When he left at around 9:55, he noticed the same two men in back of the parking lot.

LaDonna Porter testified that she drove her car to work on September 10, 1981, and as she entered the Gateway parking lot at Monroe and Canal about 10:10 p.m., she saw a car coming down the ramp. The car stopped in such a way that it blocked the entrance and the driver called for help. He then pulled his car over into a parking space and slumped over the wheel. She went to his car and heard him say, "Help me, help me, help me, I've been stabbed by two black guys up in the parking lot."

Thomas Spraggins testified that about 10:15 p.m. on September 10, 1981, he was standing outside the front door of the Cafe Bohemia, one block south of the Gateway garage, when he saw two men running down the sidewalk toward him and away from the parking garage. The taller, darker person was wearing blue jeans, but he didn't have an opportunity to observe his shirt, and the other man wore light beige pants and a leather jacket. One of the men carried a shoulder bag.

Detective Wilcosz testified that on September 10, 1981, he and his partner went to the Gateway garage and, after talking to police investigators there, they cruised the area looking for the offenders and for evidence. On the basis of information received from some men sitting in front of the Cafe Bohemia, they drove into certain alleys and companion ways. In a dead-end alley at 207 South Jefferson, they found a

brown shoulder bag, a green clothing bag, and various other items of clothing, including a blue shirt, a pair of blue jeans, and a pair of light trousers. The green clothing bag contained a few pieces of paper, including a portion of a Sun-Times newspaper with a telephone number and a part of a notebook or telephone book with two names and telephone numbers.

Pathologist Tae Ann testified that the cause of death was the two stab wounds to the chest which lacerated the heart and lung and caused massive internal bleeding.

Jeremiah Lynch testified that on September 12, 1981, he introduced himself to Thomas as an assistant State's Attorney at the police station; informed him of his *Miranda* rights and asked whether he had any questions about them. Thomas said that he had no questions. With Officer O'Connor present, Lynch interviewed Thomas twice following which he gave a court-reported statement which he read, initialed some corrections he wanted on it and then signed it.

Officer O'Callaghan testified that when he told Robinson that he was going to conduct some lineups he asked him if he would like to call his attorney. When Robinson then asked to talk to him he advised him of his *Miranda* rights. Robinson said he understood them and stated that he still wanted to talk about the case, but "felt that he was being hooked up into it." Robinson said that he would give bits and pieces and some clues as they went along and although he could furnish the whole case, he was going to be very careful and give him only a little bit at a time.

Robinson then told O'Callaghan that he was sitting in a schoolyard on the west side, drinking and "smoking some reefer" with Darryl Thomas and another person. After they began to talk about robbing people, the three of them took the Douglas "L" to the loop but Robinson decided that he didn't want to be involved and got off the "L." He "went out south and partied all night." O'Callaghan asked him for the location of the party and the name of the people so that he could check out the alibi but Robinson just answered that he could put the case together and said he would show him where to find the murder weapon and some other evidence. O'Callaghan, Officer Triggs, and defendant then drove in a police car to the loop, where Robinson directed them to pull into a dead-end alley off Jefferson between Adams and Jackson. Robinson got out of the car and, after looking into a dumpster, he walked directly to a small staircase and looked under it. Finding nothing, he said that "somebody must have found the stuff" because there should have been some articles of clothing lying around. He then directed them to an alley to look for

the knife, but none was found. He said that his information about the killing came from Darryl Thomas and his friend. After they returned to the station, O'Callaghan told Robinson that the police had already talked to Kenneth Wallace, the other person at the schoolyard, and after Robinson was shown parts of Darryl Thomas' statement, he said that he had been lying and now wanted to tell the truth. He then gave another account of the incident, one in which he said Wallace was the one who left the "L" early and that their plan was to steal a car, ride to the north side to pick up and rob some prostitutes, and then go to a disco. Darryl Thomas had the tools to wire a car in his case, and Robinson had a brown bag with a change of clothing. They went to a parking lot on Canal, and, after walking through all five levels, Thomas told him that he was going to wire a car on the second floor. Robinson said he went to the first floor and Thomas came running down a short time later with a knife in his hand. As they ran from the lot Thomas said that he "had to ice a guy up there." They ran into the alley where they changed their clothes and rode the "L" back to the west side.

O'Callaghan said that he told Robinson later that the victim didn't die immediately but had told people at the scene he was stabbed by *two* black guys, following which Robinson told him basically the same story until their arrival at the parking lot. From that point he gave a different version; namely, that he and Thomas while waiting for somebody to rob saw the victim and discussed robbing him, but Robinson said he was pretty big and that it would be better to wait for somebody else. They decided, however, that they could handle the victim and they jumped him. He resisted strongly and when Robinson felt they were going to lose the fight he "got off the victim" and started to run from the lot. Thomas was running behind him, and Robinson saw that Thomas was carrying the knife which he had used to stab the man. They ran past the Cafe Bohemia and, after changing their clothes in the alley, boarded the "L."

O'Callaghan also testified that Robinson informed Assistant State's Attorney Palmer that he had already told O'Callaghan the whole case and that he wasn't going to say anything else to anybody because he wanted a fighting chance in court. On cross-examination, O'Callaghan said that Robinson gave him three different versions of the incident but refused to give a written statement. The conversations were not put in writing but he did put the information into his report.

The parties stipulated that a wallet with $48 and miscellaneous identification was taken from the victim.

Tiola Phillips, Darryl Thomas' mother, testified in his defense that two plainclothes detectives came to her house very early on the morning of September 12, 1981, but Darryl was not home. They left a card with her and when Darryl came home she called the detectives and met them when they arrived. As Darryl and the officers walked to the corner and got into the car, she noted that Darryl was not handcuffed. She was permitted to go with them to the station, but before going they rode around in the car for about an hour looking for Wesley Robinson and then parked in the alley near her home for about 15 minutes. When they arrived at the police station, the officers took Darryl into a room and told her and Linda to wait in another area.

OPINION

I

■■■ Relying on *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, defendant Thomas contends that his statement to the police should have been suppressed because his detention was a custodial interrogation which was not supported by probable cause. In *Dunaway*, the United State Supreme Court held that detention for custodial interrogation without probable cause violates fourth amendment safeguards against illegal arrests. "Illinois courts have followed *Dunaway* when they have determined that, under the totality of the circumstances, a defendant was taken into custody despite a disclaimer by the police of any intention to arrest." (*People v. Reed* (1982), 104 Ill. App. 3d 331, 335, 432 N.E.2d 979, 983.) An arrest occurs when the police inform a suspect of a violation, he submits to their control, and it is clearly shown that the officers intended to make an arrest and defendant so understood. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.) The absence of a threatening presence of several officers, display of a weapon, a physical touching, use of language or tone of voice which indicates that compliance with the officer's request might be compelled, permits, as a matter of law, the conclusion that no seizure of the person has taken place. (*United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870; *People v. Holloway* (1985), 131 Ill. App. 3d 290, 475 N.E.2d 915.) Other factors to be considered in this inquiry are:

> "*** the location [citation], time [citation] length [citation], mood and mode [citation] (including extent of knowledge of facts possessed by police) of the interrogation; the number of police officers present [citation] and the presence or absence of

friends or family of the accused [citation]; any indicia of formal arrest of the subject including physical restraint, show of weapons or force, booking, fingerprinting or informing the person he is under arrest [citation]; the manner in which the person questioned go to the place of interrogation, *i.e.*, voluntarily on his own, in response to a police request, or on a verbal command indicating compulsion [citation]; whether he voluntarily assists police in their investigation [citation]; whether the subject is allowed to walk within and from the location of the interrogation unaccompanied by police [citation]; and the age, intelligence and mental makeup of the accused [citation]." (*People v. Savory* (1982), 105 Ill. App. 3d 1023, 1028, 435 N.E.2d 226, 230.)

Before turning to a review of the evidence here, we note that where the trial court has conducted an evidentiary hearing on a motion to suppress, its ruling will not be disturbed unless it is manifestly erroneous (*People v. Reynolds* (1983), 94 Ill 2d 160, 445 N.E.2d 766), and that a reviewing court may also consider any evidence adduced at trial which supports the trial court's finding. *People v. Sakalas* (1980), 85 Ill. App. 3d 59, 405 N.E.2d 1121.

In the instant case, Officer O'Connor testified that Thomas was asked if he would accompany them to the police station for an interview and he agreed to do so. Officer Markham testified that Thomas was not in custody at that time and was free to leave. While Thomas testified that he did not think he had the right to leave the police car, his subjective opinion is not controlling as the underlying question is "whether, considering all the circumstances, a reasonable man, innocent of any crime, would have considered himself under arrest ***." (*People v. Miller* (1980), 89 Ill. App. 3d 973, 978, 412 N.E.2d 175, 179-80, *cert. denied* (1981), 454 U.S. 871, 70 L. Ed. 2d 175, 102 S. Ct. 339.) Here, Thomas was not told that he was under arrest and the usual procedures associated with an arrest were totally absent. He was not fingerprinted, photographed or handcuffed until after his statement. While his mother testified that he was handcuffed when he left the police car, and Thomas testified that he was handcuffed to a ring on the interview room wall, the trial court was entitled to believe the contrary testimony of Officer Markham that Thomas was not handcuffed until after he was placed under arrest following his statement. The assistant State's Attorney who was present during Thomas' statement also testified that Thomas was not handcuffed or restrained in any way in his presence. In our review of the circumstances surrounding Thomas' statement, we find his mother's testi-

mony at trial particularly significant with respect to the voluntary nature of Thomas' cooperation. She testified that two detectives simply left a business card at her house and asked her to have Thomas get in touch with them when he returned home. She gave Thomas that message, and when he returned home, he actually called the detectives and met them when they arrived. We believe his own actions indicate the voluntary nature of his cooperation with the police.

Thomas argues also that the actions of the police showed a significant assertion of power and thus an intent to restrain him and, in support of such argument, relies heavily on the exclusion of his mother and his girlfriend from the actual interview room. However, police action in allowing someone to accompany an individual to the station has been viewed as an accommodation of that individual and thus an indication of a lack of intention to restrain. (See *People v. Reed* (1982), 104 Ill. App. 3d 331, 432 N.E.2d 979). In *Reed*, defendant's girlfriend remained in the main office while he was taken to the interview room. Here, Thomas' girlfriend left in the police car with him while they toured the area, and after the car returned to Thomas' home, his mother asked and was allowed to accompany them to the police station. They both went to the second floor and were allowed to sit outside the interview room from which point his mother testified that she could see him through the window. We thus find Thomas' argument with respect to the police officers' assertion of power over him to be without merit.

■ Under the totality of circumstances in this case, including the voluntary nature of Thomas' actions and the lack of any indication of force on the part of the police officers, we cannot say that a reasonable man in defendant's position would have considered himself in police custody when he accompanied the police to the station and remained there for questioning. We therefore find that the trial court properly denied his motion to suppress his statement.

## II

■ Defendant Robinson also contends that the trial court erred in denying his motion to suppress an oral statement which he argues was made after he had invoked his right to counsel. When an accused invokes his right to counsel, his response to further questioning is admissible only if he "(a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." (*Smith v. Illinois* (1984), 469 U.S. 91, 95-96, 83 L. Ed. 2d 488, 494, 105 S. Ct. 490, 493, citing *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880.) In this regard, we note that a trial

court's decision with respect to the admissibility of a statement by a defendant will not be reversed unless it is contrary to the manifest weight of the evidence (*People v. Metoxen* (1983), 121 Ill. App. 3d 472, 459 N.E.2d 975), and that a direct conflict between police officers' and defendant's testimony is a question of credibility best resolved by the trial court. *People v. Underwood* (1982), 108 Ill. App. 3d 846, 439 N.E.2d 1080.

■ Here, Officer O'Callaghan testified that he brought Robinson from the lockup in order to conduct a lineup and that he told him that he should call his attorney if he wanted to notify him about the lineup. Robinson said that he didn't think he had to call his lawyer because he could probably straighten out the whole matter for the police. After O'Callaghan reminded him that his rights were still in effect and again specifically advised him regarding those rights, Robinson stated that he understood them but wanted to cooperate in putting the case together because he was in jail even though he was innocent. While the testimony of the police officer[1] clearly showed that defendant initiated the discussion which led to his statement, he now argues that bringing him from the lockup for a lineup was simply a ploy used by the officer to obtain an incriminating statement from him and that the police procedure thus constituted initiation of interrogation. In support of his argument, he cites *Rhode Island v. Innis* (1980), 446 U.S. 291, 64 L. Ed. 297, 100 S. Ct. 1682, in which the United States Supreme Court recognized the possibility of using lineups as part of a police interrogation scheme designed primarily to elicit an incriminating statement and held that *Miranda* safeguards come into play whenever a person is subjected to either express questioning or its functional equivalent. (See also *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) In *Innis*, however, the court referred to practices other than the standard lineup, such as the use of a coached witness who would be sure to select the defendant as the perpetrator of the crime. Another practice to which the court referred was the reverse lineup, "in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime, with the object of inducing him to confess to the actual crime of which he was suspected in order to escape the false prosecution." (*Rhode Island v. Innis* (1980), 446 U.S. 291, 299, 64 L. Ed. 2d 297, 306-07, 100 S. Ct. 1682, 1689, citing *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 100 S. Ct. 1602.) We do not believe

---

[1]Although defendant denies the officer's version of the events, as we have previously noted, the trial court was entitled to believe the officer's testimony.

the lineup in the instant case could be considered a practice of the type found improper in *Innis*, and we believe the very section quoted by defendant makes this quite clear.

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (Emphasis added.) (*Rhode Island v. Innis* (1980), 446 U.S. 291, 301, 64 L. Ed. 2d 297, 308, 100 S. Ct. 1682, 1689-90; see also *People v. Brownell* (1984), 123 Ill. App. 3d 307, 462 N.E.2d 936.)

A straightforward lineup certainly constitutes police action which is "normally attendant to arrest and custody." Here, attempts were made to locate witnesses on both the date of defendant's arrest and on the following day, but the witnesses were not available. The first lineup took place only a half hour after the return of Robinson and the officers to the station after their trip to look for evidence which was suggested by him, and the two other lineups followed shortly thereafter. We believe this militates strongly against defendant's characterization of the lineup as a mere ploy. We note that the same result is obtained when the lineup is analyzed pursuant to the court's use of "initiate" in *Edwards*. "[I]nquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards*." (*Oregon v. Bradshaw* (1983), 462 U.S. 1039, 1045, 77 L. Ed. 2d 405, 412, 103 S. Ct. 2830, 2835.) We therefore find that the lineup here was not the functional equivalent of express questioning and thus did not constitute interrogation. As a result, we believe that the trial court properly concluded that defendant, rather than the police, initiated the further discussion which led to the statements.

■ ■ Because there was no *Edwards* violation, the next step in our inquiry is to determine "whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." (*Edwards v. Arizona* (1981), 451 U.S. 477, 486 n.9, 68 L. Ed. 2d 378, 387 n.9, 101 S. Ct. 1880, 1885 n.9.) The existence of a valid waiver was therefore a question for the trial court to decide on the basis of the surrounding facts and circumstances, including defend-

ant's background, experience, and conduct. (*People v. McKinney* (1983), 117 Ill. App. 3d 591, 453 N.E.2d 926.) In this regard, we note that Robinson was 20 years old at the time of the confession and had passed his GED examination. These facts, together with the changes made in his versions of the homicide as more details were given to him by the police, indicate that he was more than capable of making an intelligent waiver of his rights. The testimony of the police officer shows that the waiver was made, and while Robinson also contends that such waiver was the result of police coercion, he makes no allegation of physical coercion, and, although he did testify initially that Officer O'Callaghan would not give him food (chicken) if he didn't give a statement, he admitted during cross-examination that he had never actually been told that he could not have the chicken unless he answered questions. In arguing psychological coercion, Robinson relies on his testimony that he was brought from the lockup to the interrogation room for questioning by Officer Markham several times between his arrest on September 14 and the lineup on September 16. Markham testified, however, that he did not question Robinson after he had asserted his right to counsel, and to the best of his knowledge, his partner, Officer O'Connor, did not question defendant. Officer Robertson, who was in charge of locating the witnesses for a lineup on September 15, testified that he did not speak to Robinson and that, as far as he knew, no other officer talked to him. Officer O'Callaghan also testified that he went to get Robinson for the purpose of conducting a lineup and that Robinson began the conversation which led to his statements, testimony which directly conflicts with defendant's version thereof. Although the general rule is that the State must produce all material witnesses connected with the taking of the statement or explain their absence, it has also been held that it is not necessary, in the context of determining the voluntariness of a confession, to call people who were in and out of the room and did not participate in taking the confession. (See *People v. Tyler* (1984), 128 Ill. App. 3d 1080, 471 N.E.2d 968.) Although Robinson asserted that he was questioned by certain officers who had not testified, he was unable to name or otherwise identify any. Perhaps realizing the impossible burden which would be placed on the State in such circumstances, on appeal, he now suggests as an alternative that the State should have called the lockup officials to satisfy its burden of proof. He did not object to the prosecution's failure to call the allegedly material witnesses as he is required to do by statute (Ill. Rev. Stat. 1983, ch. 38, par. 114—11(d)), however, and his failure to object waives this issue for purposes of the appeal. *People v. Cole* (1985), 131 Ill. App.

3d 36, 475 N.E.2d 620.

In view of the foregoing, we find that the trial court did not err in refusing to suppress Robinson's statement.

## III

■ Thomas next contends that the exclusion for cause of persons adamantly opposed to the death penalty denied him equal protection of the law and violated his sixth amendment right to a representative jury. The Illinois supreme court has consistently rejected the argument that qualification of prospective jurors pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, denies a defendant his sixth and fourteenth amendment rights. (See *People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223 (*cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 298, 105 S. Ct. 362; *People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200; *People v. Lewis* (1981), 88 Ill. 2d 129, 430 N.E.2d 1346, *cert. denied* (1982), 456 U.S. 1011, 73 L. Ed. 2d 1308, 102 S. Ct. 2307.) Thomas nevertheless urges us to consider *Grigsby v. Mabry* (E.D. Ark. 1983), 569 F. Supp. 1273, *aff'd as modified* (8th Cir. 1985), 758 F.2d 226, *cert. granted sub nom. Lockhart v. McCree* (1985), 474 U.S. ___, 88 L. Ed. 2d 48, 106 S. Ct. 59, where the court found that a *Witherspooned* jury was, as an empirical fact, more likely to convict than a jury drawn from a cross section of the community. In *Caballero*, however, the Illinois Supreme Court noted the *Grigsby* opinion in rejecting a similar argument and, in a more recent case, the court reiterated that position, stating:

"Furthermore, the United States Supreme Court recently clarified its decision in *Witherspoon* regarding when jurors could be excused because of an unwillingness to consider the death penalty. The court rejected the often-quoted standard, drawn from Witherspoon footnote 21, which implied that jurors could be excused for cause only when it was unmistakably clear that they would *automatically* vote against the imposition of the death penalty regardless of the evidence (see *Witherspoon v. Illinois* (1968), 391 U.S. 510, 522, n.21, 20 L. Ed. 2d 776, 785 n.21, 88 S. Ct. 1770, 1777 n.21), and held that the proper 'standard is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' (*Wainwright v. Witt* (1985), 469 U.S. 412, 422-26, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852.) In deciding *Wainwright*, the court was aware of the *Grigsby* lower court decision and the *Keeten* decision and

the studies allegedly showing that death-qualified juries are conviction prone. (*Wainwright v. Witt* (1985), 469 U.S. 412, 431 n.11, 83 L. Ed. 2d 841, 874 n.11, 105 S. Ct. 844, 871 n.11 (Brennan, J., dissenting).) We do not believe that the Supreme Court would be clarifying the standard for determining when a juror may be excused for cause and choosing a lesser standard than some lower courts have been applying if the actual exclusion of the juror would result in the defendant being denied his constitutional rights. In light of the Supreme Court's decision in *Wainwright v. Witt*, we adhere to our position and reject the argument that the qualification of jurors pursuant to *Witherspoon* results in a conviction-prone jury so as to deny a defendant his constitutional rights." (*People v. Collins* (1985), 106 Ill. 2d 237, 278-79, 478 N.E.2d 267, 285-86.)

We do note that the United States Supreme Court recently granted a writ of *certiorari* in *Grigsby* (see *Lockhart v. McCree* (1985), 474 U.S. ___, 88 L. Ed. 2d 48, 106 S. Ct. 59), but, until the court holds otherwise, we will follow *Caballero* and *Collins*.

Since Thomas contends that the trial court erred in refusing his pretrial motion to waive a jury for sentencing, he argues that the above cases do not control here. We note, however, that the same argument was rejected in *People v. Wolfbrandt* (1984), 127 Ill. App. 3d 836, 469 N.E.2d 305. As here, the defendant in *Wolfbrandt* attempted to waive a sentencing jury but did not wish to waive a jury trial on the issue of guilt or innocence. The trial court refused to accept the waiver which was tendered during *voir dire*. The court noted that it was "not unmindful of the strategic benefits which the defendant might think may arise from having his guilt or innocence decided by a jury not qualified to recommend the death penalty ***." (127 Ill. App. 3d 836, 844, 469 N.E.2d 305, 312), but it held that, under the language of the statute, a waiver in advance of conviction in a jury trial is untimely made and thus not permitted. (See Ill. Rev. Stat. 1983, ch. 38, par. 9—1(d).) We therefore conclude that the trial court did not err in denying Thomas' attempted pretrial waiver of a jury for sentencing.

## IV

Defendant Thomas also contends that he was denied a fair trial by the State's introduction of evidence regarding the victim's family and its comment thereon in closing argument. Mrs. Weinschenk testified, in pertinent part, that she had been married to Charles Weinschenk for 20 years; that they had three children who were aged 21, 20 and 15

at the time of trial; that he had been working for Western Electric for 27 years and as a part-time policeman for Merrionette Park for 14 years; that he had recently been transferred to downtown Chicago; and that he drove his car to work and parked at Gateway Parking on Canal. During rebuttal closing argument, the prosecutor stated that "Bridget Weinschenk had the right of the love of her husband, of twenty years, and each of Charles Weinschenk's children ***." Defense counsel objected to the comment, and the trial court sustained the objection and ordered the jury to disregard it.

■■ ■ It is established that it is improper to make references to a victim's family where the information has no relevance to defendant's guilt or innocence. (*People v. Bernette* (1964), 30 Ill. 2d 359, 197 N.E.2d 436.) We do not condone the questions here about the victim's children and the further question eliciting their ages, but we note that every mention of a deceased's family does not entitle a defendant to a new trial (see *People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200), and even where such mention is made, a defendant is not entitled to a new trial where, as we find here, the testimony was not presented in such manner as to cause the jury to believe it was material (*People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200), or that the evidence is otherwise sufficient to support the conclusion that the errors did not contribute to the guilty verdict. (*People v. DeSavieu* (1984), 120 Ill. App. 3d 420, 458 N.E.2d 504.) Thomas also argues that the prejudicial effect here is heightened by the prosecutor's reference to the victim's family in closing argument. The prosecutor's comment was as follows:

"I have the right to walk the streets of this city, they have the right to walk the streets of this county safely and securely, Bridget Weinschenk had the right of the love of her husband, or [*sic*] twenty years, and each of Charles Weinschenk's children—."

The impropriety of this remark was cured when the objection to this comment was sustained and the jury was instructed to disregard the statement. We also note that the comment was not particularly inflammatory, especially when compared to the prosecutor's comment in *People v. Bartall* (1983), 98 Ill. 2d 294, 456 N.E.2d 59, which was found not to have affected the verdict of the jury. That comment was as follows:

"Let's talk about this girl's rights. To say good night to your grandma 'good night, I'm going, be back. Can I borrow your

car? Can I go back to school in a couple of days? Can I say goodbye to my brothers and sisters?'

Does she have any more rights?

* * *

She's got nothing because he took it upon himself to take the gun out of his pocket or out of his shoulder holster and snuff her life away in a ridiculous and unmotivated and ignorant, ignorant lack of responsibility. That's what he did.

You decide, ladies and gentlemen, what it's all about, you take the law, you take the evidence, you say if somebody shoots this thing it's a reckless act at four people, *and then you tell the Quinn's what you decided.*" (Emphasis in original.) *(People v. Bartall* (1983), 98 Ill. 2d 294, 322, 456 N.E.2d 59, 72-73.)

The comment in the present case would certainly have a much smaller effect on a jury than the type of the comment made in *Bartall*. Finally, we note that evidence and argument concerning the victim's family is more likely to be considered harmless error where, as here, the death penalty is not involved. See *People v. Bartall* (1983), 98 Ill. 2d 294, 456 N.E.2d 59; see also *People v. Ramierez* (1983), 98 Ill. 2d 439, 457 N.E.2d 31.

In the context of this case, we do not believe the evidence and comment thereon constituted reversible error since it did not dwell on the victim's family and was not of such a nature as would contribute to a guilty verdict.

## V

■ Defendant Thomas also maintains that the introduction of irrelevant evidence—that the victim was a part-time police officer—and the comments thereon prejudiced him and denied him a fair trial. It is the function of the trial court to balance the probative value and the prejudicial effect of the evidence sought to be introduced *(People v. Rachel* (1984), 123 Ill. App. 3d 600, 462 N.E.2d 959), and its resultant ruling on the admission of the evidence is subject to reversal only where there has been an abuse of discretion. *People v. Ward* (1984), 101 Ill. 2d 443, 463 N.E.2d 696.

Evidence is relevant if it tends to make a proposition at issue either more or less probable. *(People v. Rachel* (1984), 123 Ill. App. 3d 600, 462 N.E.2d 959.) During the motion *in limine,* the prosecutor asserted that the victim's position as a part-time police officer was relevant in connection with evidence expected to be introduced to show that the victim was capable of handling himself during a struggle. Since the record indicates that the extent of Thomas' participation in

the murder was at issue, we do not believe the evidence was totally without probative value. See *People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200.

With respect to the prejudicial effect on Thomas, we believe that testimony of the victim's wife regarding his part-time employment was incidental to her testimony as a life and death witness and we cannot say that it had an inflammatory effect on the jury's ability to rationally evaluate the facts (*People v. DeSavieu* (1984), 120 Ill. App. 3d 420, 458 N.E.2d 504), particularly when her testimony made it quite clear that he was not functioning as a police officer during this incident. We thus cannot say that Thomas was denied a fair trial by the admission of this evidence and the comment thereon.

## VI

■ Thomas makes the additional argument that the prosecutor's use of three peremptory challenges to exclude all black persons from the jury denied him a representative jury in violation of the sixth amendment. Thomas does agree, however, that the Illinois Supreme Court's holding to the contrary in *People v. Payne* (1983), 99 Ill. 2d 135, 457 N.E.2d 1202, *cert. denied* (1984), 469 U.S. 1028, 83 L. Ed. 2d 372, 105 S. Ct. 447, controls this issue and, in the light thereof, we find this argument does not require further discussion.

## VII

■ Finally Thomas posits that he was denied a fair trial during opening statement when Robinson's counsel made certain objections to Thomas' counsel's summary of his statement to the police. Thomas argues that the objections had the effect of informing the jury that Robinson disagreed with Thomas' version of the incident and that, by sustaining the objections, the trial court implied to the jury that it also disagreed with Thomas' story. We note, however, that Illinois Pattern Jury Instruction (IPI), Criminal, No. 1.01 (2d ed. 1981), told the jurors not to concern themselves with the reasons for the court's rulings on evidence and, more specifically, that the court's rulings did not indicate an opinion regarding the facts. We therefore find defendant's argument to be without merit.

Furthermore, the only authority cited by Thomas for this argument, *People v. Daugherty* (1984), 102 Ill. 2d 533, 468 N.E.2d 969, is not supportive. In *Daugherty*, it was held that denial of a motion for severance was an abuse of discretion even though the prosecutor stipulated that he would not use either of the two codefendants' state-

ments, each of which implicated his codefendant, at trial. The court held that, despite the stipulation, the closing arguments of counsel "produced a spectacle where the People *** stood by and witnessed a combat in which the defendants attempted to destroy each other. [Citation.]" *(People v. Daugherty* (1984), 102 Ill. 2d 533, 547, 468 N.E.2d 969, 975.) No such spectacle occurred in the present case.

Our review of the record in this case shows that the trial court did grant the severance and meticulously required that evidence pertaining to Robinson be heard out of the presence of the Thomas jury. We note in particular that the trial court did not hear closing arguments in Robinson's case until after the Thomas jury rendered its verdict and had been discharged. It appears also that the trial court specifically informed the jurors that two defendants were charged with the crime; that Thomas' jury trial would proceed at the same time as Robinson's bench trial; and that the jurors not concern themselves with Robinson. It appears that the jury clearly knew, in the light of such instructions given by the trial court before the trial even began, that they were to disregard Robinson's objections as being relevant only to his case.

We believe defendant was not prejudiced by the objections made by Robinson's counsel, and we thus find his argument to be without merit.

## VIII

■■ With respect to sentencing, both Thomas and Robinson contend that they were improperly sentenced to an extended term of 60 years for murder and, in support thereof, they argue that the murder was not accompanied by "exceptionally brutal or heinous behavior indicative of wanton cruelty" as required by statute. (See Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(b)(2).) Although the trial court's decision with respect to sentencing should not be reversed in the absence of an abuse of discretion *(People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882), extended-term sentencing was not intended to enhance the punishment for every offense. *(People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520.) Conduct is heinous if it is "hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal." Brutal includes conduct which is "grossly ruthless, devoid of mercy or compassion: cruel and cold-blooded." *(People v. LaPointe* (1982), 88 Ill. 2d 482, 501, 431 N.E.2d 344, 353.) In *People v. Nester* (1984), 123 Ill. App. 3d 501, 462 N.E.2d 1011, the court, in affirming an extended-term sentence for murder, relied primarily on the cold-blooded nature of an attack upon a person who had already been beaten in a

fight, and it found that the murder was exceptionally brutal or heinous behavior indicative of wanton cruelty.

Here, the trial court also relied solely on the cold-blooded nature of the crime when it imposed the extended-term sentence. However, we do not believe the murder here to be so cold-blooded that it may be characterized as exceptionally brutal or heinous behavior indicative of wanton cruelty. The murder occurred during an attempted armed robbery, and a stipulation was entered that a wallet containing $48 was recovered from the victim. Certainly, defendants were not so calm and cold-blooded that they were able to continue with the robbery, and we find no other acts which would support an extended-term sentence. (See, for example, *People v. Holiday* (1985), 130 Ill. App. 3d 753, 474 N.E.2d 1280.) We believe the statutory language "exceptionally brutal or heinous behavior" would be without effect if we were to affirm the imposition of an extended sentence in this case and, thus, pursuant to Supreme Court Rule 366(a) (87 Ill. 2d R. 366(a)), we reduce each of the sentences for murder to 40 years, the maximum sentence for murder. Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1).

## IX

■■■ Also with respect to sentencing, Thomas contends that he was denied a fair hearing when the prosecution allegedly used defendant's silence as evidence of his participation in an armed robbery for which he had not yet been to trial. We initially note that testimony regarding misconduct which had not resulted in prosecution and conviction may be considered in a sentencing hearing. (*People v. LaPointe* (1982), 88 Ill. 2d 482, 431 N.E.2d 344.) The prosecution presented two witnesses who identified defendant as the individual who had robbed a downtown McDonald's restaurant. Thomas presented alibi evidence with respect thereto. His mother testified that he told her that he and his girlfriend, Linda Parks, spent the night of the robbery at a motel on Cicero Avenue. Detective Battistella testified that, during his investigation of the robbery and after defendant's arrest, he went to a motel on Cicero Avenue. On cross-examination, the prosecutor attempted to discover what had prompted the officer to visit the motel. Defendant objected to the following questions and asserts on appeal that they constituted an attempt to infer Thomas' guilt from his post-arrest silence. (See *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240.)

"[Prosecutor]: Officer Battistella, the defendant never told you that he was at a motel at the time of the incident, did he?

[Thomas' attorney]: Objection.

THE COURT: I will take the answer. I am giving both sides great latitude in the hearing and [sic] aggravation and mitigation. I will take the answer. I don't know where you are going with that question or answer.

Can you answer that question?

THE WITNESS: Yes, Judge. He didn't tell me anything at all.

[Prosecutor]: So you never got any information with respect to this motel on Cicero from the defendant at the time of his arrest, did you?

THE WITNESS: Not from the defendant.

\* \* \*

THE COURT: At any time in your presence did he tell you about the Cicero motel?

THE WITNESS: No."

We cannot agree with defendant's characterization of these questions as improper comments on post-arrest silence. The questioning in itself did not constitute an improper comment on post-arrest silence when there was no comment made on the silence and where the prosecution did not draw the inference of guilt from the post-arrest silence. (See *People v. LaSumba* (1980), 92 Ill. App. 3d 621, 414 N.E.2d 1318, *cert. denied* (1981), 454 U.S. 849, 70 L. Ed. 2d 138, 102 S. Ct. 170; see also *People v. Foster* (1980), 81 Ill. App. 3d 915, 401N.E.2d 1221.) Here, no comment whatsoever was made by the prosecutor with respect to defendant's alleged silence. During closing argument at the sentencing hearing, the prosecutor did not even refer to the circumstances of the McDonald's robbery but simply mentioned that defendant participated in the Weinschenk murder and attempted armed robbery while he had another armed robbery charge pending against him. We thus find that the questioning did not constitute improper comment on silence.

Moreover, even if it could be considered improper comment, we do not agree that it would have been substantially prejudicial to defendant. The court stated that it was not trying Thomas for the McDonald's robbery and that, with respect to the Weinschenk murder, he thought that the prosecution was "going far afield." Clearly the court did not consider defendant's alleged participation in the other robbery to be particularly important and we note that the prosecutor merely indicated that another charge was pending at the time of sentencing. Defendant also argued that the trial court relied heavily on defendant's alleged participation in the McDonald's robbery as evidence of

his lack of rehabilitative potential when it decided to impose the extended-term sentence. We note, however, that defendant had an extensive criminal record which was more than sufficient to overcome the mitigation evidence consisting of defendant's statement of remorse and the testimony of his pastor, his mother and his sister. In this context, then, and in the light of our finding that the facts of this case do not support an extended-term sentence, we do not believe defendant was prejudiced by the colloquy in question during the sentencing hearing.

For the reasons stated above, we affirm the convictions for murder and attempted armed robbery, but we reduce the extended-term sentences for murder to regular terms of 40 years.

Affirmed as modified.

MEJDA* and LORENZ, JJ., concur.

---

*This opinion was adopted as the opinion of the court prior to the retirement of Mr. Justice Mejda.