THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL KELLY, Defendant-Appellant.
Third District   No. 3—84—0681

Opinion filed July 19, 1985.

Raymond A. Bolden, P.C., of Joliet, for appellant.

Edward F. Petka, State's Attorney, of Joliet (John X. Breslin and Howard R. Wertz, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE WOMBACHER delivered the opinion of the court:

Following a bench trial, Michael Kelly, the defendant, was convicted of the offenses of murder and felony murder (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(2), 9—1(a)(3)), and sentenced to a 22-year term of imprisonment.

Eight-year-old Lagresha Thomas provided the following account. On Saturday, November 19, 1983, Sharice, Lagresha and Nancy Thomas resided with the defendant and his wife, Wanda, who were adopting them. That day, after six-year-old Sharice showed the

defendant her papers, the defendant asked Lagresha to hand him a stick, which he used to hit Sharice's hand. She cried and fell to the floor. The defendant hit her again and, when she tried to get away, Wanda held her. That night Sharice slept on the living room floor. The following day, Sharice limped, and her hand was swollen. Wanda spanked her and may have poured water on her. The defendant dumped her in water and grabbed her naked body by the neck and threw her onto the bed. That Monday, Sharice stayed home from school. Lagresha saw Sharice wiping off blood. When Lagresha came home from school, Sharice was watching television. Lagresha was not allowed to speak to Sharice, who was getting spankings Saturday through Tuesday. On Tuesday, November 22, 1983, Lagresha went to school, but Sharice was ill and stayed home. The defendant took Nancy to school. When Lagresha came home about 3 p.m., Sharice was home alone eating cereal. She requested water, spilled it and then fell on the floor. Lagresha was not to baby Sharice, so she kept washing the dishes. At approximately 4 p.m., Wanda came home, picked up Sharice by the wrist and took her into the bedroom. Sharice had been vomiting for several days. She spoke strangely and dragged her feet when she walked. Wanda dressed Sharice to go to the store, but Sharice stayed home while Wanda, Nancy and Lagresha went. When they returned, Lagresha noticed that Sharice's eye and mouth were open. Wanda called the ambulance, and the defendant and they both told Lagresha to say that Sharice fell into a hole. The defendant informed H. Diane White, the Department of Children and Family Services child abuse investigator, that on Tuesday, Sharice was vomiting, but helped him fix the sink. He also said that a babysitter stayed with Sharice when he went to work at about 2:45. Wanda called him at work to say that she was taking all the children shopping; again to say that Sharice was not well; and a third time to say that Sharice had no pulse.

Park Forest South police officer Kevin Woods answered Wanda's call and found Sharice unconscious. Since she had no vital signs, he performed cardiopulmonary resuscitation (CPR). Then Allen Mannel, the ambulance driver, arrived. Wanda informed him that Sharice had been sick for at least two days, and that she had last seen Sharice after her bath an hour earlier. After an endotrachael tube was inserted, Sharice still had no vital signs, and so the paramedics transferred her by ambulance to the hospital, where the defendant informed Mannel that Sharice fell into the crawlspace three days ago.

Dr. Ira Asher, the emergency room physician, examined Sharice and found she was not breathing and had no heartbeat. He inserted a

tube into her windpipe and started two IV's. He noted bruises on her forehead, arms, legs and sides and abrasions on her buttocks. He opined that the large bruises resulted from bleeding from the muscles through the tissues, and except for the forehead bruise, did not result from one fall. He found no fractures or infection. He opined that the bruises were between one hour and four days old and that the neck bruises could have resulted from neck pressures or intubation. Vomiting has numerous causes, including fatally bruised brain or a head blow, which can also cause momentary dizziness, unconsciousness and walking difficulty. Strangling or grasping the neck can restrict the blood flow and cause swelling and hemorrhaging.

Later, Officer Woods returned to the hospital to inform the Kellys that his department was investigating Sharice's death. At the station, the emotional defendant told Officer Michael Flowers that he felt guilty because he left the lid off the crawlspace after he worked on the plumbing. On Sunday, Sharice's legs hurt from falling into the crawlspace. On Monday, she was vomiting, and stayed home from school. That day, he placed an elastic bandage on her swollen arm.

In the early morning of November 23, 1983, Officer Ronald Baumgartner accompanied White to the Kelly residence to take protective custody of Lagresha and Nancy for foster home placement. While at the residence, the Kellys explained that the victim's excessively hard play habits may have caused the bruises. The defendant cried and showed White and Baumgartner the open crawlspace. The defendant also told White that the victim fell out of bed the day before. He once struck the victim, but since the children were abused by their natural mother, he did not believe in hitting them.

Officer James Funches arrested the defendant on November 25, 1983, and read the *Miranda* rights to the defendant, who cried and proclaimed his innocence. Funches allowed the defendant to use the phone. The defendant, however, did not recall that his rights were read to him. The defendant was taken to a Chicago police station, where he and his wife were allowed to make calls. Wanda tried to call an attorney. At another Chicago facility, the defendant spoke with attorney Ellston, who told him to keep quiet. The defendant thought that the attorney informed the Park Forest South police that they had an attorney. The defendant hugged Officer Robert Coleman and volunteered that he did not kill the victim.

After the defendant arrived at the Park Forest South Station, Officer Baumgartner read the defendant his *Miranda* rights. The defendant indicated his understanding and stated his willingness to speak without an attorney. The defendant then signed the rights waiver. The

defendant never asked to call an attorney, but was emotionally and physically upset during the interview. The defendant never requested food, but was given coffee. The defendant told Coleman that he last disciplined Sharice on Saturday and that he had struck her with a belt and a stick. Coleman then overheard the defendant tell his mother that he spanked the victim on Sunday. The defendant also admitted that he fabricated the crawlspace story. The defendant was upset when Coleman, not knowing the truth, pointed out strangulation evidence in the pictures. Coleman also told the defendant that he knew Wanda strangled the victim. After tearing the written statement, the defendant reverted to the crawlspace story.

The defendant testified that he ws unsure if his rights were read to him. The defendant testified he told Coleman that he did not want to speak and that he wanted to and did call his attorney. However, Coleman wanted to speak with him as friends. Coleman showed the defendant the bloody belt that was used to beat Sharice, her panties, and a picture of a stick which he untruthfully represented as containing her flesh.

According to David Metzger, a forensic scientist, the blood type on the underwear retrieved from the Kelly residence matched the victim's blood type.

Dr. Hugo Romeu, a Cook County medical examiner and pathologist, noted during the autopsy that the child had neck abrasions and injuries on the back of the neck, buttocks, thighs and arms. The neck marks were consistent with fingernail marks and corresponded to internal strap muscle injuries. In his revised opinion, strangulation was a supervening, intervening cause of death. The doctor also noted that the child's linear buttock abrasions resulted from an intentional beating. The forehead, chin, and left forearm injuries could have resulted from a fall, but the neck injuries which were less than three days old were intentionally inflicted but not during CPR. The child had 48 external injuries, but no internal bleeding or organ damage. The child showed traces of hemorrhaging and brain swelling caused from strangulation. The neck injury could have resulted from neck grasping and throwing.

Dr. Edward Shalgos, a pathologist, reviewed the medical reports and photographs and noted hemorrhagic strains in the left skull and lesions on the buttocks and thighs. He opined that the victim died of progressive shock incidental to beating. The vomiting and mental fogging supported his conclusion. The neck lesions were caused by grasping her neck and contributed to her general trauma. Shock broadens the body capillaries, which become wide, thin and porous. The blood

stagnates in the vessels and less blood circulates, accentuating anoxia or lack of oxygen. Fluids then pass unrestricted and attract water, and the blood protein pours through and attracts water in the spaces between the organs, yielding body organ edema. Eventually, the heart is deprived of oxygenated blood; heart failure supervenes; and pe techia or minute hemorrhages result from the open capillaries. Strangulation connotes asphyxial neck structure compression and tissue anoxia. The doctor compared the evidence of front and back neck manual handling, but eliminated strangulation as the cause of death due to the extensive traumatic injuries and the age of the neck hemorrhages as compared to the other lesions. The victim was severely traumatized and quite ill. Her demeanor, the nausea and the vomiting prior to death were typical of shock changes. The esophagus changes were consistent with vomiting and due to the cellular structure, in his opinion, were as old as the neck and buttock lesions. The neck lesions could have been caused by grasping and throwing three days before death, rather than from the persistent compression of strangling.

The defendant presented Damian Golis to verify that the defendant left work on November 22 because Sharice was not breathing. White then related that Lagresha told her that Sharice was watching television when she came home on Tuesday. Wanda came home about 4 p.m. and angrily picked Sharice off the kitchen floor and took her to the bedroom. Sharice vomited and went in the bathroom, and then Lagresha and Nancy cleaned up the floor.

Dr. Edmund Donoghue, the Cook County medical examiner, who supervised the autopsy, opined that the numerous abrasions and bruises indicated the victim was beaten, but considered the cerebral edema and the epiglottis hemorrhaging and the injuries in concluding that strangulation was the immediate cause of death. He opined that Sharice died immediately after the strangling but that the right neck fingernail marks could have resulted from picking the child up by the neck or from strangulation. Those injuries could not have occurred three days before death. He also noted left muscular hemorrhages and petechial hemorrhages in the epiglottis and that the tissue samples showed reactions at most six hours old. The doctor stated that cerebral edema could occur after death and that the epiglottis hemorrhage could result from the intubation. He recognized that the victim had 61 bruises and was severely beaten. However, no damage occurred to the internal organs, so he ruled out beating as the cause of death. He found no evidence of progressive shock but did find a head injury beneath the scalp and an old brain contusion. He did admit that kidney, liver and adrenal gland edema and vomiting are a sign of progressive

shock but that vomiting can signify other problems. The lungs showed edema consistent with strangulation and the cerebral edema was consistent with strangulation. The extensive bruises could have produced walking difficulty.

The court found that Lagresha's testimony established that the victim fell when the defendant struck her hand with a stick on November 19, 1983. The defendant raised her; continued to beat her with a stick; and had Wanda Kelly hold her when she attempted to escape. The next day, after Wanda spanked and poured water on the victim, the defendant splashed more water on her, grabbed her by the neck, and threw her on the bed. The following day Lagresha saw the victim wipe blood from her posterior. Prior to her death, the victim was forced to sleep on a door, frequently vomited, walked with a limp, and spoke abnormally. Lagresha and her sister were not allowed to talk to the victim. The victim was unable to get up after falling on the floor on the day of death.

The court next found that the circumstantial evidence established the victim was brutally beaten and that the defendant's resulting guilt caused him to fabricate the story that the victim fell into the crawlspace and to divulge that Wanda struck the child with a stick. The defendant and Wanda had a four day common design to beat and abuse the victim. Therefore, the defendant was accountable for his and Wanda's acts.

The court then determined that if the child had been intentionally strangled, that alone would have been the supervening, intervening cause of death. The court recognized the conflicting medical evidence and found the physical evidence more aligned with Dr. Shalgos' opinion that the neck marks may have resulted from strangulation, and that death resulted from secondary shock from the beatings.

The court doubted that Wanda would have strangled the child, visited the grocery store, sent Lagresha to check the victim upon their return, and then become panic stricken by the fact that the victim was not breathing. The court ruled that beyond a reasonable doubt, beatings caused the death. The defendant knew that his acts created a strong probability of bodily harm but not death. The defendant struck the victim's head and body and thus killed her while committing aggravated battery to a child.

The defendant initially argues that the court erred in denying his motion to suppress his involuntary statement of November 25, 1983. The defendant asserts that he was emotionally upset and confused, and his will was overborne by the officer's deception and cajolery. The State responds that the totality of the circumstances supports the

court's ruling, and, alternatively, any possible error was harmless beyond a reasonable doubt.

Prior to trial, the defendant filed a motion to suppress his statements, alleging that his *Miranda* rights were violated and that the involuntary statements were coerced. The court found that on November 25, 1983, Officer Funches arrested the defendant and gave him the *Miranda* warnings; that his attorney advised him to remain silent; that at the Park Forest South police station the defendant attempted to call his attorney and the police again read him his *Miranda* warnings; and that the defendant signed a written waiver. The court held that the defendant waived his right to speak with an attorney present. Therefore, the motion was denied as to statements made on that day since they were voluntary.

■ A defendant may knowingly and intelligently waive his right to remain silent during custodial police interrogation (*People v. Merrero* (1984), 121 Ill. App. 3d 716, 459 N.E.2d 1158), and is responsible for voluntary admissions and confessions which are admissible unless acquired by trick, promises, or threats. *People v. Stevens* (1957), 11 Ill. 2d 21, 141 N.E.2d 33.

The totality of the circumstances determines whether a statement was voluntarily given, and the trial court's finding will not be disturbed unless it is contrary to the manifest weight of the evidence. The test is whether the statement was made freely, voluntarily and without compulsion or inducement or whether the defendant's will was overcome when he confessed. However, misinformation consisting of speculative evidence against the defendant does not result in a constitutional violation. *People v. Lee* (1984), 128 Ill. App. 3d 774, 471 N.E.2d 567.

■ Nothing in the record indicates that the defendant did not understand his constitutional rights or that he was the victim of physical compulsion. He spoke to an attorney prior to the questioning, but still, after making phone calls, chose to speak to the officers when confronted with the available physical evidence. He then chose not to write a statement. Based on the circumstances, we find the trial court's ruling that the statement was voluntary was not against the manifest weight of the evidence.

■ The defendant next argues that he was not proved guilty beyond a reasonable doubt where the trial court's ruling was based on technical, contradictory medical evidence which did not conclusively prove that he caused the victim's death. The State responds that the autopsy evidence, the victim's physical condition at death, and the medically determined cause of death support the conclusion that the

defendant's conduct caused the victim's death beyond a reasonable doubt.

To prove murder, the State must establish beyond a reasonable doubt that death was caused by criminal activity. The existence of a time interval between the defendant's act and death does not preclude such a casual link. Instead the adequacy of the evidence depends on the autopsy; the defendant's acts related to the physical condition at death; and the explanations of the reasons underlying the cause of death. *People v. Brown* (1978), 57 Ill. App. 3d 528, 373 N.E.2d 459.

The defendant's acts need only have contributed to the death (*People v. Clark* (1984), 129 Ill. App. 3d 374, 472 N.E.2d 814), and the defendant may be accountable even though he had no intent to and did not personally kill the victim. *People v. Ray* (1979), 80 Ill. App. 3d 151, 399 N.E.2d 977.

A mere conflict in the evidence does not raise reasonable doubt of guilt. An expert witness' credibility and the weight accorded to his testimony are determined by the trier of fact. (*People v. Platter* (1980), 89 Ill. App. 3d 803, 412 N.E.2d 181.) That determination and a finding of guilty will be disturbed only when the evidence is so unreasonable, improbable and unsatisfactory as to leave a reasonable doubt as to the defendant's guilt. *People v. Carpi* (1976), 44 Ill. App. 3d 364, 358 N.E.2d 355.

■ The medical evidence was not so improbable, contradictory or unsatisfactory as to raise reasonable doubt of guilt. The undisputed fact that the defendant severely battered and injured the child supports the court's conclusion that the defendant's beatings contributed to her death. That conclusion is not altered by the time lapse between the defendant's acts and the child's death or by the fact that Wanda also beat the child. We find no reason to disturb the court's resolution of medical conflicts, interpretation of autopsy results, and reliance upon Dr. Shalgos' opinion that the victim died from progressive shock incidental to the beating. That conclusion is supported by the evidence of the victim's mental and physical condition prior to death. Even if the defendant neither intended to nor personally killed the victim, the defendant still knew that his acts created a strong probability of bodily harm. Therefore, there was no reasonable doubt which would allow us to disturb the finding of guilty.

■ Finally, the defendant argues that he was a "parent in fact" who recklessly disciplined the victim. Based on the court's finding that he had no intent to kill, and the doubt as to cause of death, he argues that this court should reduce the degree of the defendant's offense to involuntary manslaughter. The State responds that the evi-

dence overwhelmingly supports the court's proper finding that the defendant knew his acts created the strong probability of great bodily harm.

Due to an evidentiary weakness, this court may reduce the degree of the offense of which the defendant was convicted. *People v. Meadows* (1981), 92 Ill. App. 3d 1028, 416 N.E.2d 404; 87 Ill. 2d R. 615(b)(3).

However, absent a showing that the trial court was misinformed as to the applicable law or committed error which created doubt as to the court's finding, the conviction will not be reduced. (*People v. Carpi* (1976), 44 Ill. App. 3d 364, 358 N.E.2d 355.) Since the victim died, the defendant's relationship to the child does not entitle him to a special penalty. (Ill. Rev. Stat. 1983, ch. 38, par. 12—4.3.) On the contrary, the evidence in this case supports the trial court's findings that the defendant was guilty of murder. He was not an innocent bystander. He not only severely beat and disciplined the six-year-old victim, but even though he was in the process of adopting her, then neglected her. Therefore, based on the record in the instant case, we decline to reduce the degree of the offense of which the defendant was convicted.

Accordingly, the judgment of the circuit court of Will County is affirmed.

Affirmed.

HEIPLE, P.J., and STOUDER, J., concur.