THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KENNETH COLE, Defendant-Appellant.

First District (5th Division) No. 86—0391

Opinion filed April 22, 1988.—Rehearing denied June 22, 1988.

Thomas Peters, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Kenneth T. McCurry, and John A. Gasiorowski, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Between 12:15 and 12:20 p.m. on October 21, 1983, Karen Matthews was shot and killed while in the lot of an Amoco gas station located on the northwest corner of the intersection at 75th Street and Stoney Island Avenue in the south side of Chicago. Following a jury trial defendant Kenneth Cole, the victim's boyfriend, was found guilty of the murder and was sentenced to a prison term of 28 years. On appeal, defendant Cole contends: (1) no probable cause existed to support defendant's arrest; (2) defendant's guilt was not proven beyond a reasonable doubt at trial; (3) the court below erred in qualifying a State's witness as an expert and permitted improper opinion testimony pertaining to the results of a gunshot residue test to determine whether defendant had fired a gun shortly before his arrest; (4) the unavailability of a subpoenaed defense witness prejudiced defendant's case; and (5) remarks made by the assistant State's Attorney in closing argument were improper.

We affirm.

The following, adduced at trial, is pertinent to our disposition.

Linda Eichelberger, Lovey Copland, and Bonnie Johnson were in an automobile, facing eastbound on 75th Street, waiting at the intersection of 75th Street and Stoney Island Avenue for the traffic light to change at approximately 12:15 p.m. on October 21, 1983. Eichelberger and Johnson both testified that, as they were waiting to

proceed, they heard a gunshot and immediately turned to their left to see, directly across 75th Street at a distance of 20 to 25 feet, the victim screaming that she had been shot. The victim was standing next to a blue and white Cadillac Seville which was situated in the lot of the Amoco station. The victim was standing within the area created by the open right front passenger door of the vehicle. As Eichelberger and Johnson watched, the victim collapsed, the driver reached over to close the passenger door, backed the car up, and proceeded down an alley behind the Amoco station. Both witnesses testified that they saw the full face of the driver and stated that he wore a white or light-colored hat. Eichelberger made a courtroom identification of defendant as the driver of the vehicle. Eichelberger also testified that defendant's hat, which was admitted into evidence, was the one she had seen defendant wearing on the day of the murder even though, on cross-examination, she admitted that she did not notice that the hat had any yellow (embroidery) on it, or had the word "captain" printed on it.

A stipulation was admitted into evidence on the last day of the trial which established that, following the murder, Detective Henry Sigler conducted a short interview with Eichelberger during which time she did not describe the offender by height or weight and neglected to describe any hat.

Dawn Morgan, the cashier on duty at the Amoco station that morning, also testified to observing the same events. Morgan similarly made a courtroom identification of defendant as the driver of the vehicle. Morgan testified she had seen the defendant in the Amoco station with the same Cadillac on two or three occasions prior to the day of the murder. She stated that on the day of the murder, she saw defendant in the automobile and saw that he was wearing a white baseball cap. Morgan testified that during the course of events in the Amoco lot that morning, she never lost sight of defendant. On the following day, she identified defendant Cole as the assailant out of a police lineup. At trial, Morgan was shown a photograph of the lineup and indicated defendant was the individual she had earlier identified.

Arthur Stovall, an employee of a Popeye's Chicken fast-food restaurant located on Stoney Island Avenue beside the Amoco station, testified that sometime shortly after noon on October 21, 1983, he was walking westward, diagonally, across the lot of the Amoco station on his way to a hardware store nearby. He noticed the blue and white Cadillac parked beside a pay telephone. The victim was talking on the telephone. The automobile was running. As he neared where the victim was standing, he began to exchange greetings with the victim.

Stovall testified that as he attempted to continue the conversation, the victim, facing 75th Street, appeared to become "kind of scared." Stovall turned to see a man he identified as the defendant coming toward the victim from across 75th Street. The defendant was wearing a white baseball cap. Stovall testified that the defendant told the victim to get into the car.

Stovall stated that as he resumed his walk, he heard a gunshot, turned back towards the direction of the sound, and saw defendant, still wearing the white cap, back the Cadillac up and "shoot down the alley." On the following day Stovall also identified defendant Cole as the assailant out of a police lineup, and also, at trial, identified defendant from a photograph of that lineup. On cross-examination, Stovall admitted that in 1978 he had been convicted of armed robbery.

With regard to Stovall's testimony, Chicago police department detective Charles Salvatore was permitted to later testify that in the late afternoon on the day of the murder, he had telephoned Stovall about the incident. Detective Salvatore stated that Stovall, at that time, told Salvatore over the telephone that the assailant had gotten out of a taxi cab. Stovall had described the assailant as a light-skinned black male, 5 feet 7 inches tall, weighing 135 pounds, and having curly hair, a description which did not fit that of defendant. Detective Salvatore also stated that Stovall had told him that the assailant had not worn a hat.

In his own testimony, Stovall denied giving such a description.

Fannie Glenn, another eyewitness to the murder, testified on behalf of defendant Cole to a considerably different set of facts than the previous eyewitnesses. Glenn stated that at approximately 12:15 p.m. on the day of the murder, she was walking west across Stoney Island Avenue with her granddaughter when they were almost struck by a speeding car containing three individuals: two males and a female. She testified that the car turned on 75th Street, made a U-turn around the median, and "went up on the side of the filling station." While the car was still in motion, she heard a gunshot. She next saw the victim fall out of the car and scream. Glenn testified that the driver of the car had a darker complexion than the defendant.

On cross-examination Glenn was unable to describe the automobile other than to say it was dark colored, either black or navy blue. Glenn further testified that the police at the scene had only allowed her to tell "a little" of what she had witnessed, but she admitted that she never called the police afterward regarding the incident. She also admitted that later, in November of 1983, when police did contact her for the purpose of showing her photographs of possible suspects, she

told police over the telephone that she could not identify anyone.

Three alibi witnesses also testified on behalf of the defendant.

The defendant's mother, Mary Cole, testified that she placed a call to defendant from a pay telephone at her beauty salon at 12 noon on the day of the murder and spoke with defendant about a family event to take place that night.

Carolyn Smith, a friend of defendant's and an acquaintance of defendant's family, testified that between 1 and 1:15 p.m. on the day of the murder, the defendant was in a Foremost Liquor store at 1529 Hyde Park Avenue, where Smith was employed as a lottery ticket cashier.

Seneca Boxton, the victim's roommate, testified that the last time she saw the victim was on October 20, 1983, in the evening preceding the day of the murder, when the victim left their apartment to spend the night with her boyfriend, defendant Cole. Boxton testified that, later that evening, she also left the apartment to spend the night with a boyfriend, John Washington, at a hotel. Boxton testified that between 12:10 and 12:15 p.m. on the day of the murder, she called defendant from the hotel room's telephone in an attempt to locate the victim. Boxton stated that she was certain of the approximate time because she had been watching a particular television soap opera which had begun at 12 noon. Boxton stated she talked to defendant for three to four minutes.

On cross-examination, Boxton admitted that she was a friend of the defendant's and had seen the defendant twice since the victim was murdered. She also testified that, even though she first tried to locate the victim at 9 a.m. on the morning of the day of the murder, her next attempt to locate the victim, at defendant's apartment, was not until 12 noon.

Over defense objections, Mary Grobarcik, a Chicago police department chemist, was qualified by the trial court as an expert and was allowed to give opinion testimony concerning her analysis of a gunshot residue test performed on sample swabbings taken from defendant's hands shortly after defendant was arrested in the afternoon following the murder. In her opinion, the analysis showed that defendant Cole had fired a handgun within four to six hours of his arrest.

The subject matter of Grobarcik's qualifications, and her testimony, as well as that of Edward Rudzitis, an expert called by the defense to rebut her testimony, is more fully set forth below in our discussion relative to disposition on admissibility of the results of the test analysis.

I

We first address whether probable cause existed to support defendant's arrest.

The following testimony, adduced during a pretrial hearing on defendant's motion to quash his arrest and to suppress evidence, is relevant to our disposition on the issue.

Officer Kevin Marshall testified that on October 21, 1983, he monitored a radio assignment in connection with the homicide of Karen Matthews. Based upon a description of the automobile involved and a partial license plate number identification, Marshall had toured the area of the murder within 10 minutes of the assignment and observed the Cadillac parked in an alley five to six blocks from the scene. Marshall testified that he had conducted a surveillance of the automobile from an unmarked car for 10 to 15 minutes and arrested Dwayne Russell after observing Dwayne Russell enter the automobile and begin to drive away. Officer Marshall stated that, at that time, the only description of the wanted offender was of a black male, with a white or beige hat. Officer Marshall testified that no hat or gun was found in the car.

Later that afternoon, while in the Third District Police Station, Marshall testified that he was informed that police had just received an inquiry about the recovered Cadillac and were given the name and address of the subject who inquired about the automobile. After being so informed, Officer Marshall, his partner Officer Robertson, and Detective Henry Sigler went to defendant's apartment in response to the inquiry. The officers arrived at defendant's apartment and, in the course of speaking to defendant from the open doorway, Officer Marshall noticed a white hat placed either on or near a couch inside. Marshall testified that the officers asked, and were permitted, to enter defendant's apartment. The officers asked defendant if he had any weapons in the house, and defendant gave Officers Marshall and Robertson permission to retrieve the weapons from under the bed in his bedroom.[1] The officers informed defendant that they were investigating a homicide, that defendant's vehicle had been recovered near where the homicide occurred, and asked defendant to accompany them to the police station. Officer Marshall stated defendant agreed to so accompany the officers.

Detective Sigler also testified to observing a white hat on a couch inside defendant's apartment during the conversation with the defend-

---

[1]The record indicates the weapons were a .22 caliber "sawed-off" rifle and a shotgun.

ant at the open doorway. Detective Sigler further stated that during the time Officers Marshall and Robertson were in defendant's bedroom, Sigler remained with the defendant. At that time, Detective Sigler learned that the defendant was the victim's boyfriend, that the victim had spent the previous night with the defendant, that the defendant had seen the victim on the day of the murder, and that, in fact, the victim had been with him in defendant's Cadillac. Defendant also told the officers that someone had called defendant and told him that they knew the location of his automobile.

In reference to when the defendant was placed under arrest, Detective Sigler stated that a report he later prepared indicated defendant was arrested at his apartment at 3:20 p.m. on October 21, 1983. However, Detective Sigler testified that defendant was never actually told he was under arrest during the time the officers were at the apartment. Detective Sigler also stated that, although the defendant had agreed to accompany the officers to the police station, he conceded that defendant was not, at that time, free to leave and would have been handcuffed and placed under arrest had defendant refused to go.

Defendant Cole also testified during the hearing on the motion. Defendant admitted that the police officers had gone to defendant's apartment in response to defendant's telephone call in which defendant told police that he was the owner of the subject Cadillac. The defendant stated that he had not asked the officers into the apartment; however, defendant admitted that the officers entered the apartment without using any force. Defendant was not shown a warrant. Defendant further testified that his cap was not on the couch, but was in his closet.

Based on the above testimony, the trial court denied defendant's motion to quash his arrest and suppress evidence.

We note initially that the trial court, in denying defendant's motion, failed to reach a conclusion as to when defendant's arrest actually occurred. While such a determination is not crucial to our analysis of probable cause, as the record indicates the trial court, in any event, denied defendant's motion based upon the finding that probable cause existed at the time the police were at defendant's apartment, we are compelled to clarify that issue.

■■ Generally, an "arrest" occurs when the police inform a suspect of a violation, he submits to their control, it is clear that the officers intended to make an arrest, and defendant so understood. (*People v. Thomas* (1985), 139 Ill. App. 3d 163, 486 N.E.2d 1362.) In determining the intentions of police in the absence of a formal decla-

ration of arrest, the absence of that declaration, as well as the absence of other routine procedures associated with an arrest, such as handcuffing, are factors to be considered. (*People v. Clay* (1984), 124 Ill. App. 3d 140, 463 N.E.2d 929.) In examining the understanding of defendant, the test is not based on subjective belief, but rather, is whether a reasonable innocent person in defendant's situation would have considered himself arrested or free to go. *People v. Reynolds* (1983), 94 Ill. 2d 160, 445 N.E.2d 766.

■ Although the record discloses no intention on the part of police to make an arrest when they first arrived at defendant's apartment, testimony presented during hearing on defendant's motion to quash his arrest and suppress evidence sufficiently establishes the arrest occurred at the moment defendant was asked to accompany the officers to the police station. By that time police had advised defendant of the investigation of the shooting of Karen Matthews, had questioned defendant about when he had seen the victim, had asked defendant specifically whether he possessed any weapons, and had retrieved those weapons. We believe a reasonable person when thereafter "asked" to accompany police officers to the police station would have concluded that he was not free to decline. Detective Sigler's testimony further establishes that defendant was then effectively under arrest since Sigler did not then consider defendant free to leave and Sigler intended to handcuff and "formally" arrest defendant had defendant so refused to accompany the officers.

Having determined when the initial arrest occurred, we turn to whether the court below properly concluded that cause for defendant's arrest existed.

■ A warrantless arrest is justified under the criminal code where a police officer has reasonable grounds to believe that a person has committed an offense. (Ill. Rev. Stat. 1985, ch. 38, par. 107—2(1)(c).) For purposes of arrest, reasonable grounds and probable cause are synonymous in Illinois. (*People v. Wright* (1974), 56 Ill. 2d 523, 309 N.E.2d 537.) Probable cause to arrest exists where a reasonable and prudent man, having the knowledge of facts and occurrences possessed by the officer at the time of the arrest, would believe that the arrestee has committed the offense in question. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 445 N.E.2d 766.) The probability of criminal activity, not proof beyond a reasonable doubt as required to obtain a conviction, is the standard for assessing probable cause. (*Spinelli v. United States* (1969), 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584; *People v. Exline* (1983), 98 Ill. 2d 150, 456 N.E.2d 112.) Whether the necessary probability exists is governed not by technical legal rules,

but rather by commonsense considerations that are factual and practical. (*Brinegar v. United States* (1949), 338 U.S. 160, 93 L. Ed. 1879, 69 S. Ct. 1302; *People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147.) Further, on review, the trial court's finding of probable cause will not be disturbed unless manifestly erroneous. *People v. Williams* (1985), 137 Ill. App. 3d 736, 484 N.E.2d 1191.

Defendant Cole argues that probable cause supporting his arrest did not exist for two reasons. Defendant first contends that the description of the alleged assailant as a "black man who might be wearing a white or beige hat" was too general to serve as the basis for arrest. Defendant notes that the description failed to contain detailed information regarding the suspect's height, weight, hairstyle, age, or specific clothing worn.

Defendant also argues that the requirement of probable cause to support arrest prohibits the arrest of multiple suspects for crimes, such as the murder here, which involve only one offender. Defendant contends that that prohibition is particularly appropriate to defendant's arrest since, defendant contends, evidence implicating Dwayne Russell was greater than that implicating defendant.

■ ■ While a general description alone is insufficient to provide the requisite probable cause to justify an arrest, when coupled with other relative facts and circumstances known to the arresting officer, a basis for a proper arrest may be established. (*People v. Mills* (1968), 98 Ill. App. 2d 248, 240 N.E.2d 302.) Contrary to defendant's assertions, testimony presented at the suppression hearing established that the arresting officers acquired significantly more information in addition to the concededly general description of the assailant known to the officers when they arrived at defendant's apartment. The police learned there that defendant was the victim's boyfriend, that defendant had spent the night previous to the day of the murder with the victim, that defendant had been with the victim in defendant's Cadillac on the day of the murder, and that defendant's automobile was recovered in connection with the homicide. The police also discovered that defendant had a white hat. Aware that the victim had been shot, the police learned that defendant had weapons in his apartment.[2] The police also knew that defendant's inquiry about the Cadillac came after the murder had occurred.

■ Further, in determining whether the trial court's finding of

---

[2]The record does not disclose whether the arresting officers knew, at the time, the type of weapon used in the homicide; however, it is not disputed that neither was, in fact, the murder weapon.

probable cause on defendant's motion was proper, we are not restricted to examining only the testimony presented at the pretrial hearing, but may consider evidence later adduced at trial contributing to facts known to the officers at the time of the arrest. *Carroll v. United States* (1925), 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280; *United States v. Bolin* (7th Cir. 1975), 514 F.2d 554; *People v. Valentin* (1985), 135 Ill. App. 3d 22, 480 N.E.2d 1351.

At trial, the jury heard the testimony of Dwayne Russell and two other individuals in relation to events which occurred in close temporal proximity to the murder of Karen Matthews.

Valencia Davis testified that on October 21, 1983, at approximately 12:15 p.m., she was in her apartment at 7249 Blackstone and had just talked to her friend, Jackie Lee, on the telephone and had asked Jackie Lee to pick her up. Sometime shortly after Davis hung up the telephone, she heard the sound of screeching automobile tires. Davis observed, from her window, the subject Cadillac Seville below in the alley. Davis testified that she witnessed a black man wearing a light-colored hat exit the vehicle, leaving the motor running and the car door open, and run to and enter another automobile which had just arrived.

A few minutes later, Lee and her brother Dwayne Clark arrived. As the three left Davis' apartment, Lee went over to the Cadillac, turned off the car, took the keys, and also removed a telephone bill she found in the glove compartment. Davis stated that she and the others present devised a plan to call the name on the telephone bill and inform that person that they knew the whereabouts of the automobile for the purpose of extracting a reward for that information. They proceeded to pick up Dwayne Russell and continued on to Lee's apartment.

At the apartment, Davis testified, Lee called the number on the phone bill. Raymond C. McPartlin, a representative of Illinois Bell Telephone, later confirmed from phone records that a telephone call was placed from the telephone number registered to Jackie Lee to the telephone number registered to defendant Cole at 12:49 p.m. on October 21, 1983. McPartlin testified that a conversation lasting nine minutes took place.

After a short time, Davis, Russell, and Clark returned to Davis' apartment. Davis stated that she and Clark left Dwayne Russell near the Cadillac and went to purchase beer at a nearby store. Upon their return, they witnessed Dwayne Russell, driving the Cadillac, in the process of being arrested.

Jackie Lee also testified to the above sequence of events. Lee

added that she remembered that defendant's name had been on the telephone bill taken from the glove compartment of the Cadillac.

The testimony of Dwayne Russell was substantially consistent with that of Davis and Lee. Russell testified that Lee picked him up from his apartment at 7717 South Dobson at approximately 12:30 p.m. on October 21, 1983. With Lee were Davis and Dwayne Wilson. On the way back to Lee's apartment, the plan to extract a reward from the owner of the Cadillac was discussed with Russell. At the apartment, it was decided that Russell, Davis, and Wilson would return to the automobile and drive it back to Lee's apartment. Russell testified that Lee gave him the keys. Russell, Davis, and Wilson returned to where the Cadillac was located. Russell was dropped off nearby. He testified that he cautiously approached the automobile, entered it, and began driving away. He was shortly thereafter arrested by police. It was approximately 1 p.m. Most significantly, Russell testified that within 30 minutes of his arrest, he related the above account to the police.

We consider the testimony of Dwayne Russell important for purposes of determining the existence of probable cause to arrest defendant because it indicates that, later that afternoon, when police, including Officer Marshall, investigated defendant's inquiry concerning the Cadillac, they were aware of Dwayne Russell's explanation for his presence in the automobile.

In view of the totality of the above evidence we do not agree with defendant's contentions that sufficient probable cause did not exist to support arrest. Far from indicating that the police merely possessed knowledge consisting of the arrest of the probable offender, Dwayne Russell, and had only a general description of the wanted individual at the time they arrived at defendant's apartment, the record discloses the officers had reason to believe that Russell did not commit the murder and were aware of considerable information connecting defendant to circumstances relating to the crime. Moreover, defendant does not cite to, nor are we aware of, any case authority in this State which precludes the arrest of more than one suspect for a crime involving only one offender on facts such as are presented in the case before us. Therefore, we cannot say that the finding of the court below of probable cause to arrest was manifestly erroneous.

## II

We next consider whether evidence produced at trial was suffi-

cient to establish defendant's guilt beyond a reasonable doubt.

◼ When presented with a challenge to sufficiency of the evidence, a court of review will not substitute its judgment for that of the jury and set aside a criminal conviction unless the evidence is so unsatisfactory that it creates a reasonable doubt of defendant's guilt. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 478 N.E.2d 402; *People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671.) Issues as to the relative credibility of witnesses and weight to be given to their testimony are matters for the jury, as the trier of fact, not the appellate court, to determine. (*People v. Jaffe* (1986), 145 Ill. App. 3d 840, 493 N.E.2d 600.) On review, mere conflict in that evidence does not raise reasonable doubt of guilt. *People v. Kelly* (1985), 136 Ill. App. 3d 154, 482 N.E.2d 614.

◼ Defendant's arguments focus on the inherent weakness associated with positive identification of offenders through eyewitness testimony of strangers at trial. Specifically, defendant points out discrepancies in the testimony of Arthur Stovall, regarding the mismatch of the description of the offender given over the telephone to police shortly after the murder with his subsequent identification of defendant at trial, and that of Linda Eichelberger, regarding the identification of defendant and defendant's hat at trial even though it was stipulated that she had earlier failed to describe the assailant's physical appearance, hat, or other clothing in detail. Defendant further argues Dawn Morgan's testimony was effectively rebutted by that of Fannie Glenn, who asserted that the driver of the automobile she saw was not defendant, and that of the victim's roommate, Seneca Boxton, who testified defendant was at his apartment at the approximate time of the murder. Defendant also contends that the explanation of how Dwayne Russell possessed the means to enter and drive away defendant's Cadillac shortly after the shooting, as established by his testimony as well as that of Jackie Lee and Valencia Davis, is implausible based on the amount of time available between the time of the murder and the time of Russell's arrest.

Our review of the record and consideration of defendant's specific contentions above do not persuade us that defendant's conviction was based on evidence so "palpably contrary to the findings or so unreasonable, improbable or unsatisfactory [as to raise] a reasonable doubt of guilt" so as to warrant reversal. (*People v. Schuning* (1984), 125 Ill. App. 3d 808, 814, 466 N.E.2d 673, 678, *rev'd on other grounds* (1984), 106 Ill. 2d 41, 476 N.E.2d 423.) Ignored in defendant's contentions above, regarding in-court identification by eyewitnesses, is the fact that on the day following the murder, the

defendant was identified out of a police lineup by two individuals, Arthur Stovall and Dawn Morgan. Each later testified, with respect to a photograph of the lineup at trial, that the defendant was the same person they had earlier so identified. Further, Dawn Morgan was not a complete stranger to the defendant. She testified that she recognized defendant from being in the Amoco station on previous occasions. Defendant similarly ignores the testimony of Bonnie Johnson, who also identified defendant at trial and stated that she had observed defendant's full face at the time of the murder.

While, as defendant suggests, uncorroborated eyewitness testimony is subject to inherent weaknesses, no such problem is present from a review of the testimony presented in the case before us. We find no merit in further enumerating support for defendant's conviction in view that no other matter relating to sufficiency of the evidence, as raised by defendant on appeal, or as otherwise exists, is such as would be outside of the more proper determination by the trier of fact. Therefore, we find that defendant's conviction was properly supported by the evidence.

### III

The third issue raised by defendant addresses the admission of testimony at trial pertaining to the results of a gunshot residue test used to determine whether defendant had fired a gun shortly before his arrest.

In the case before us, the State, through the opinion testimony of Mary Grobarcik, was permitted to present the results of an atomic absorption analysis, a particular type of gunshot residue test. Atomic absorption analysis, or by other reference, atomic absorption spectrophotometry or flameless atomic spectrophotometry, is one of the two most commonly used analytical techniques developed by forensic scientists to determine whether a party has recently handled or fired a gun. (Krishnan, *Detection of Gunshot Residues on the Hands by Trace Element Analysis,* 22 J. Forensic Sci. 304 (1977).) While Illinois courts have addressed the admissibility of the results of the other most commonly used analytical test, neutron activation analysis (see *People v. Johnson* (1986), 114 Ill. 2d 170, 499 N.E.2d 1355), we are aware of no court of review in this State which has specifically addressed issues relating to admissibility of the results of atomic absorption analysis.

It is well established that significant amounts of lead, antimony, and barium, metallic elements used in the manufacture of bul-

let primer, are deposited as a fine dust or "gunshot residue" on the hands of an individual who has fired a gun. (Krishnan, *Detection of Gunshot Residues on the Hands by Trace Element Analysis,* 22 J. Forensic Sci. 304 (1977).) The thrust of both atomic absorption analysis and neutron activation analysis is to identify the existence of those elements on the hands of an individual who is suspected of firing a gun in connection with a crime. Annot., 1 A.L.R.4th 1072 (1980).

Both procedures utilize a method to collect the gunshot residue from the hands. Commonly, a cotton swab on the tip of a plastic or wooden stick, moistened with hydrochloric or nitric acid, is used to swab the residue from the hands. (Krishnan, *Detection of Gunshot Residues on the Hands by Trace Element Analysis,* 22 J. Forensic Sci. 304 (1977).) In neutron activation analysis, the swabs are then passed through the core of a nuclear reactor where they are bombarded with neutron particles and irradiated to test the presence of the trace elements emitted. (*State v. Major* (Mo. App. 1978), 564 S.W.2d 79.) In atomic absorption analysis, the nitric acid solution is extracted from the swab and placed on a metal strip in an instrument called a spectrophotometer. The strip is heated, causing the elements to vaporize. A light beam is passed through the vapor at specific wavelengths assigned to detect the presence of the trace elements. *State v. Chatman* (1978), 156 N.J. Super. 35, 383 A.2d 440.

In *People v. Johnson* (1986), 114 Ill. 2d 170, 499 N.E.2d 1355, our supreme court specifically noted that neutron activation analysis has come to be accepted as a consistently reliable forensic science technique and concluded, citing examples from other jurisdictions, that the results of such tests are admissible in this State in criminal proceedings. While the test in *People v. Johnson* was performed in connection with analyzing the similarity of particular cartridges, rather than on swabbings taken from a defendant's hands, those cases relied upon by the supreme court as persuasive authority were concerned with detection of gunshot residue. We therefore read *People v. Johnson* to include the acceptance of neutron activation analysis as a reliable method to test for the presence of gunshot residue on swabbings taken from a suspect's hands.

Further, our research has disclosed no basis to conclude that atomic absorption analysis is any less a scientifically reliable method of detecting gunshot residue from swabbings taken from a defendant's hands. (See Newton, *Rapid Determination of Antimony, Barium, and Lead in Gunshot Residue via Automated Atomic Absorption Spectrophotometry,* 26 J. Forensic Sci. 302 (1981).) We note

that, as with neutron activation analysis, other jurisdictions have held that the results of atomic absorption analysis are admissible in criminal proceedings for that purpose. (*E.g., Bell v. State* (Ala. Crim. App. 1976), 339 So. 2d 96; *Chatom v. State* (Ala. 1977), 348 So. 2d 838; *State v. Chatman* (1978), 156 N.J. Super. 35, 383 A.2d 440; *State v. Crowder* (1974), 285 N.C. 42, 203 S.E.2d 38, *vacated in part on other grounds* (1976), 428 U.S. 903, 49 L. Ed. 2d 1207, 96 S. Ct. 3205; *State v. Sparks* (1979), 297 N.C. 314, 255 S.E.2d 373; *State v. McCall* (Tenn. Crim. App. 1985), 698 S.W.2d 643.) We are persuaded by the reasoning of those courts and hold that the results of atomic absorption analysis are admissible in Illinois for the purpose of determining whether a suspect handled or fired a weapon.

Defendant does not directly contend on appeal that the results of the atomic absorption analysis were themselves inadmissible. Instead, defendant contends that the trial court improperly qualified Mary Grobarcik as an expert and that the opinion testimony given exceeded the limits of scientific certainty.

### A. QUALIFICATIONS OF MARY GROBARCIK

Out of the presence of the jury, Mary Grobarcik testified that she holds a bachelor of science degree in biology and a minor in chemistry from Loyola University. She has been employed as a Chicago police department chemist since 1979. Grobarcik stated that the Chicago police department has a crime lab equipped with an atomic absorption spectrophotometer made by the Varian Company. In January of 1983 she attended a training course, given by the Varian Company, in the basic mechanical operation of the spectrophotometer. Upon completion of the course, Grobarcik stated, she began testing ammunition using the spectrophotometer for the purpose of setting optimum parameters for analysis and also performed tests on swabbings taken from individuals' hands to set baseline levels to be used in testing. Grobarcik stated she performed approximately 300 such tests in order to establish testing guidelines. Grobarcik explained that, based upon the advice of other jurisdictions, it was necessary for the Chicago police department to set its own optimal levels on their own spectrophotometer. Grobarcik established her methodology for testing by conducting tests on individuals who had fired guns as well as on others who had not fired guns, including electricians and other nonpolice personnel.

On cross-examination, Grobarcik stated that the training course

she took lasted a total of five days with approximately eight hours of instruction per day. Four days of training were concerned with mechanical operation of the spectrophotometer. Only one day of training was focused on the interpretation of test results. With regard to her own testing, Grobarcik stated that, at the time the individuals were tested, she knew whether or not they had fired a gun and, if so, the approximate time of firing. She also admitted that the results of her test were not published.

Based on the above, the trial court found Grobarcik qualified to give opinion testimony as an expert witness.

On appeal, defendant argues that the trial court's qualification of Grobarcik as an expert was improper because Grobarcik had only one day of formal training in interpretation of gunshot residue analysis and because the results of her own testing procedure were unpublished.

■■■ Expert testimony is properly admissible when the subject matter is sufficiently beyond the common experience of ordinary lay individuals such that only persons of a particular skill or experience are capable of forming a judgment based on the facts presented. (*People v. Gloster* (1980), 89 Ill. App. 3d 250, 411 N.E.2d 891.) It is axiomatic that the degree and manner of knowledge and experience actually required of the expert is directly related to the complexity of the subject (*People v. Columbo* (1983), 118 Ill. App. 3d 882, 455 N.E.2d 733), and the burden of establishing those qualifications rests with the proponent of the subject testimony. (*People v. Park* (1978), 72 Ill. 2d 203, 380 N.E.2d 795.) On review, the determination below of the adequacy of qualifications, for purposes of conferring expertise status, will not be disturbed absent a clear abuse of discretion. *People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218.

■■ Grobarcik's testimony exhibited extensive knowledge and experience in the mechanical procedures of atomic absorption analysis through testimony relating to establishing the parameters for testing for the Chicago police department. Although Grobarcik admitted that the majority of her formal training was concerned with these mechanical procedures, her formal training did, in fact, include the interpretation of data derived as a result. In view of the standard of review regarding challenges to an expert's qualifications, we are satisfied that such matters go to the weight to be given testimony, rather than precluding that testimony entirely. We are unaware of any benchmark to test the requisite extensiveness of formal training or the existence of any rule which requires that an individual have published material in the field for which he intends

to testify in order to qualify as an expert. Therefore, we cannot say the trial court abused its discretion in qualifying Grobarcik as an expert.

### B. EXPERT TESTIMONY REGARDING ATOMIC ABSORPTION ANALYSIS

With regard to the gunshot residue test performed on defendant shortly after his arrest, Grobarcik stated that on October 29, 1983, she performed an atomic absorption analysis on a kit she had earlier received from the crime lab containing sample swabbings taken from defendant's hands shortly after his arrest. Grobarcik explained that the kit contained five vials. Each of four of the vials contained a swab which represented collection of residue from the palm and back areas of both of defendant's hands. The fifth vial represented an experimental control to insure that the contents of the kit had not become contaminated. Grobarcik described, in detail, the procedure for preparing the contents of the vials for analysis and subsequent testing in the spectrophotometer. Grobarcik explained that samples must be taken five to six hours after the individual has fired a weapon and that external factors, such as rubbing hands together or washing hands, may affect test results. Based on her analysis, Grobarcik stated that it was her opinion that the presence of the elements in the concentration found, especially in the area of the right palm, were consistent with bullet primer residue and characteristic of gunshot residue. Grobarcik stated that the levels of antimony and barium were particularly significant and indicated, in her opinion, that the individual from whom the samples had been taken had fired a gun within five hours of the sample's collection.

On cross-examination, Grobarcik admitted that, because the palm of the hand is ordinarily on the handle of the gun being fired, that portion of the hand is normally less exposed. She also stated that levels of the elements found on the other areas of defendant's hands, excluding the right palm area, were within normal limits. Grobarcik further admitted that a person who picked up a weapon which had been recently fired by someone else would get gunshot residue on his palm. However, in her opinion, the levels of antimony and barium exhibited were too high to have come about in that manner, even though she admitted she had never performed a test under such conditions. Further, Grobarcik conceded that the test is not conclusive as to whether a person has actually fired a weapon.

On redirect examination, Grobarcik stated that part of the web area of the hand between the thumb and forefinger constitutes both

part of the back area of the hand as well as part of the palm area. Grobarcik's opinion was that, when a gun is fired, the greatest amount of the elements would be found in the entire web area.

Edward Rudzitis was qualified as an expert to testify in rebuttal on behalf of defendant. Rudzitis stated that levels of antimony, barium, and lead present in the palm of the hand have nothing to do with the firing of a gun as the palm is held against the handle of the gun and is not exposed. Further, Rudzitis reiterated that any person who picks up a recently fired gun will get gunshot residue on his hand without actually firing the gun. With respect to Grobarcik's analysis, Rudzitis testified that, in his opinion, the levels of antimony and barium detected were not conclusive as to whether or not defendant had actually fired a gun. Rudzitis ignored the amount of lead detected because, in his own experience, the presence of lead could be caused from common sources unrelated to the purposes of the testing.

On cross-examination, Rudzitis admitted that since retirement five years prior to testifying he had not remained current in the state of the art in the field of gunshot residue analysis.

Defendant states that because Grobarcik's opinion testimony concerned a scientific field of testing, that testimony must be narrowly confined to that which is generally accepted as reliable. Defendant argues Grobarcik's opinion exaggerated the reliability of the test by stating that the results of the test showed defendant had fired a gun within hours of the test. Defendant states no authority supports such an opinion.

We do not agree. Where the results of a scientific procedure or methodology have been accepted by a court based on its reliability, the certainty of a qualified expert regarding conclusions drawn through use of that procedure or methodology goes to the weight of the testimony, not admissibility. (*People v. Columbo* (1983), 118 Ill. App. 3d 882, 455 N.E.2d 733.) Moreover, it cannot be said that Grobarcik's testimony went beyond the limits of scientific certainty. We note that in jurisdictions in which atomic absorption analysis has been accepted as scientifically reliable, opinion testimony has been admitted for the purpose of establishing that the suspect actually fired, not merely handled, a weapon. (See *State v. McCall* (Tenn. Crim. App. 1985), 698 S.W.2d 643; *State v. Crowder* (1974), 285 N.C. 42, 203 S.E.2d 38.) While we are aware that the concept of forming an opinion as to whether a person actually fired, as opposed to merely handled, a gun based on distribution of gunshot residue on different areas of the hand, absent exceptional circum-

stances, is not always reliable (Krishnan, *Detection of Gunshot Residues on the Hands by Trace Element Analysis,* 22 J. Forensic Sci. 304 (1977)), we are satisfied that formation of such a conclusion, while possibly unwise, is not completely unfounded and will be weighed accordingly by the jury.

## IV

We next consider whether the unavailability of a subpoenaed defense witness to testify at trial prejudiced defendant's case.

The record discloses, in testimony given by Detective Sigler pursuant to defendant's post-trial motion for a new trial, the following relevant facts.

Detective Sigler was subpoenaed by the defense to testify at trial on August 13, 1985. On that day, pursuant to Chicago police department procedure, Sigler went to the offices of the State's Attorney. He was not called to testify and remained in the office for the entire day. On August 15, 1985, Sigler was to begin a two-week furlough he had requested in November of the prior year. He so advised Thomas Epach, the assistant State's Attorney assigned to the case. Neither Epach nor Sigler advised either defense counsel or the court that Sigler would be on furlough through the end of August 1985. Sigler was never personally served with a second subpoena during the time he was on furlough. Following the testimony of Linda Eichelberger and up to the conclusion of trial, efforts were made by the defense to locate Sigler for the purpose of using his testimony to impeach that of Eichelberger.

Defendant argues on appeal that Sigler's unavailability to testify at trial violated defendant's constitutional right to due process as guaranteed by the fifth and fourteenth amendments. Defendant also contends that Sigler's absence violated defendant's sixth amendment right to confront witnesses since it precluded presentation of Sigler's testimony to impeach Eichelberger. Defendant further contends it was abuse for the trial court to refuse to continue the case until Sigler was made available to testify.

We find no merit in any of the arguments advanced above. Defendant sought to call Detective Sigler for the sole purpose of impeaching Eichelberger's testimony regarding the description of the assailant at the time of the murder. The record discloses that that which was sought to be established through Sigler as a witness was ultimately established by a stipulation offered by the defense. Further, we fail to see how the stipulation, in the place of the live testi-

mony of Sigler, materially prejudiced defendant. We are not here presented with a situation in which the impeachment of the testimony of the sole eyewitness to a murder is sought to be accomplished by use of a stipulation rather than more effectual live courtroom testimony. Eichelberger was not the only eyewitness to the murder. Finally, while we cannot condone the apparent established Chicago police department procedure which directed Sigler to the office of the State's Attorney on the day he was subpoenaed by the defense to appear at trial, and the apparent failure of the assistant State's Attorney to extend professional courtesy to defense counsel with notification of Sigler's scheduled absence, we are unpersuaded that in allowing the stipulation in place of live testimony and denying defendant's motion for continuance, harmful error was committed.

V

■■■ Lastly, defendant maintains he is entitled to a new trial based upon improper statements made by the State during rebuttal in closing arguments.

After reviewing the record we are unable to say that any of the allegedly improper remarks, when read in their full context, were so prejudicial as to deny defendant a fair trial. The trial court is in a better position than a reviewing court to determine the prejudicial effect, if any, of a remark made during argument and, unless clearly an abuse of discretion, its ruling should be upheld. (*People v. Smothers* (1973), 55 Ill. 2d 172, 302 N.E.2d 324.) After reading the record in its entirety and considering the comments within the context of rebuttal argument in which they are found, we cannot say that the remarks could have been a material factor in defendant's conviction. *People v. Boyd* (1980), 88 Ill. App. 3d 825, 410 N.E.2d 931.

For the reasons stated above, the conviction is affirmed.

Affirmed.

SULLIVAN and MURRAY, JJ., concur.