**UNITED STATES of America ex rel. Kenneth COLE, Petitioner,**

v.

**Richard GRAMLEY, Warden, and Michael Lane, Director, Respondents.**

No. 90 C 3131.

United States District Court, N.D. Illinois, E.D.

Nov. 7, 1990.

Mary Robinson, Robinson & Skelnik, Chicago, Ill., for petitioner.

Jack Donatelli, Asst. Atty. Gen., Chicago, Ill., for respondents.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Kenneth Cole ("Cole") was convicted in the Circuit Court of Cook County of murder and armed violence (based on the same occurrence). After Cole was sentenced to 28 years in prison for those crimes, both his conviction and sentence were affirmed by the Illinois Appellate Court (*People v. Cole*, 170 Ill.App.3d 912, 120 Ill.Dec. 744, 524 N.E.2d 926 (1st Dist.1988)), and his petition for leave to appeal to the Illinois Supreme Court was then denied.

Cole is before this Court on his 28 U.S.C. § 2254 ("Section 2254") petition (the "Petition"), brought against Dixon Correctional Center Warden Richard Gramley and Illinois Department of Corrections Director Michael Lane ("Respondents"). Each side has moved for summary judgment. For the reasons stated in this opinion, Respondents' motion for summary judgment is granted and Cole's Petition for habeas corpus is dismissed.

### Facts [1]

Between 12:15 and 12:20 p.m. on October 21, 1983 Karen Matthews ("Matthews") was shot and killed in an Amoco gas station lot on the northwest corner of the intersection of 75th Street and Stony Island Avenue on the south side of Chicago. It is that killing that ultimately led to Cole's conviction.

At about 12:15 p.m. on that day three women were in a car facing eastbound on 75th Street waiting for the light to change at the intersection. Two of the women,

Linda Eichelberger ("Eichelberger") and Bonnie Johnson ("Johnson"), testified at trial that they heard a gunshot. Both looked to their left across 75th Street to see Matthews about 20 or 25 feet from them screaming that she had been shot. Matthews was then standing next to the open front door on the passenger side of a blue and white Cadillac Seville. Matthews collapsed and the driver of the Cadillac reached over, closed the passenger door, backed the car up and drove down an alley behind the Amoco station.

Both Eichelberger and Johnson testified that they had seen the full face of the driver and that he was wearing a white or light-colored hat. Eichelberger made a courtroom identification of Cole as the driver of the Cadillac. She also identified Cole's hat that had been placed in evidence as the one she saw on the day of the murder, although she admitted that she did not recognize some of the detail on the hat. In connection with Eichelberger's testimony, the parties entered into a stipulation that Detective Henry Sigler ("Sigler") had spoken with her following the murder and that she had not then described the offender by height or weight and had not described any hat.

Dawn Morgan ("Morgan") was the Amoco station cashier that morning. Morgan had seen Cole with the Cadillac at the Amoco station on two or three occasions before the day of the murder. She testified to substantially the same events as Eichelberger and Johnson, and like Eichelberger she made a courtroom identification of Cole as the driver of the Cadillac. In addition, she said that she saw Cole wearing a white baseball cap that day and that she had never lost sight of him during the course of events. Importantly, besides her in-court identification Morgan had identi-

---

**1.** Where as here cross-motions are involved, this Court is in the Janus-like position of having to draw all reasonable inferences in favor of each nonmovant—Respondents on Cole's motion and Cole on Respondents' motion (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)). That poses no problem here, where the relevant facts are entirely those reflected by the state court record (unlike the situation where, for example, a Section 2254 petitioner asserts inadequate representation of counsel based in whole or in part on matters outside of the trial transcript itself). This statement of facts and the later recital of facts in the text of this opinion are drawn largely (though not solely) from the Illinois Appellate Court's description of the evidence adduced at trial.

fied Cole at a police line-up on the day after the murder.

Arthur Stovall ("Stovall"), an employee at the Popeye's Chicken restaurant located next to the Amoco station, was also an eyewitness to the crime. Shortly after noon on the day of the murder Stovall was walking across the lot of the Amoco station to a nearby hardware store. He saw the Cadillac parked next to a pay phone with its motor running, and he saw Matthews talking on the phone. He began to exchange greetings with Matthews when he noticed that she "got kind of scared" (R. 465), and he turned to see a man, whom he later identified as Cole, wearing a white baseball cap and walking in Matthews' direction from across 75th Street. Cole told Matthews to get in the car. Stovall started to walk away when he heard a gunshot, and he turned around to see Cole back up the Cadillac and drive down an alley. Like Morgan, Stovall identified Cole at a police line-up the next day. On cross-examination Stovall admitted to a 1978 armed robbery conviction.

Chicago Police Department Detective Charles Salvatore ("Salvatore") testified that he called Stovall later on the day of the murder and that Stovall had stated that the assailant had gotten out of a taxicab, that he was a light-skinned black male with curly hair, 5'7" tall and weighing 135 pounds (a description that did not fit Cole) and that the assailant had not worn a hat. At trial Stovall denied giving such a description to Salvatore.

Fannie Glenn ("Glenn"), an eyewitness called by the defense, testified to a different set of facts. At about 12:15 p.m. on the day of the murder she was walking west on Stony Island Avenue with her granddaughter when they were nearly struck by a speeding car containing two males and a female. After turning on 75th Street and making a U–turn, the car pulled up to the Amoco station. Glenn heard a gunshot and saw Matthews fall out of the car and scream while the car was still in motion. Glenn testified that the driver of the car had a darker complexion than Cole. On cross-examination Glenn described the

car only in terms of its being dark-colored, either black or navy blue. She said that the police who arrived on the scene allowed her to tell only a little about what she had seen, but she acknowledged that she had not called the police afterward about the incident. When the police called her the next month (November 1983) to show her photographs, she told them she would not be able to identify anyone.

Three alibi witnesses testified on Cole's behalf. His mother Mary Cole testified that at noon the day of the murder she called her son from a pay phone at her beauty salon and spoke to him about a family event to take place that night. Carolyn Smith, a second witness and a friend of Cole's, testified that she spoke with Cole between 1:00 and 1:15 p.m. on the day of the murder when he came into the Foremost Liquor store at 1529 Hyde Park Avenue, where she worked as a lottery ticket cashier. Finally, Matthews' roommate Seneca Boxton ("Boxton") testified that she last saw Matthews at their apartment in the evening before the day of the murder, when Matthews left to spend the night with Cole. Later that evening Boxton also left the apartment to spend the night with her boyfriend in a hotel. She testified that between 12:10 and 12:15 p.m. on the day of the murder she called Cole from the hotel room, trying to locate Matthews, and spoke to Cole for three or four minutes. On cross-examination Boxton said she was a friend of Cole's and had seen him twice since the murder.

Another witness, Chicago Police Department chemist Mary Grobarcik ("Grobarcik"), was qualified by the trial court as an expert over defense objection. Grobarcik gave opinion testimony, based upon her analysis of a gunshot residue test performed on swabbings of Cole's hands shortly after he was arrested in the afternoon following the murder, that in her opinion Cole had fired a handgun within four to six hours of his arrest. Edward Rudzitis was called as a defense expert to rebut her testimony. He testified that in his opinion the levels of antimony and barium found on Cole's hands were not conclusive as to whether Cole had fired a gun.

As stated at the outset of this opinion, at the conclusion of the trial the jury convicted Cole of murder and armed violence, and he was then sentenced to 28 years in prison. Having exhausted his state appellate remedies, Cole now petitions this Court for habeas corpus relief on two grounds:

1. He was denied his Fourth[2] and Fourteenth Amendment rights when he was arrested without probable cause and when he was not afforded a full and fair hearing on his Fourth Amendment claims by the state court.

2. He was denied his Fifth,[3] Sixth and Fourteenth Amendment rights to due process, to compulsory process and to confront witnesses when the prosecutor (a) released a police witness who had been subpoenaed by the defense and (b) did not notify the defense or the court that the witness would not be available for trial.

### Fourth Amendment Claim

For any successful invocation of the Fourth Amendment, Cole must overcome the hurdle set out in *Stone v. Powell*, 428 U.S. 465, 481–82, 96 S.Ct. 3037, 3046, 49 L.Ed.2d 1067 (1976) (footnote omitted):

We hold, therefore, that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

Cole argues that he was denied such a "full and fair" opportunity by the Appellate Court's consideration of evidence adduced at trial as part of its basis for finding that probable cause had existed to arrest him.

To consider the merits of that argument, it is first necessary to illuminate the necessary background.

There was a pretrial hearing on Cole's motion to quash his arrest and to suppress evidence obtained pursuant to that arrest.[4] Officer Kevin Marshall ("Marshall") testified that around lunch time on the day of the murder he and his partner Officer Robertson ("Robertson") monitored a radio transmission in connection with Matthews' homicide that gave a description of the car involved (one that turned out to match Cole's blue-and-white Cadillac), a partial license plate number and a description of the suspect as a black male with a white or beige hat. Marshall toured the area of the murder and, within ten minutes of the assignment, located the Cadillac parked in an alley five or six blocks from the murder scene. He conducted surveillance of the Cadillac from an unmarked car for 10 to 15 minutes, when he observed Dwayne Russell ("Russell") get into the Cadillac (using keys) and begin to drive it away. After following Russell for two blocks, Marshall stopped and arrested him. Russell had no white hat or gun on his person, nor was there such a hat or gun in the car.

Marshall further testified that about 3:00 p.m. that afternoon, when he was in the Third District Police Station, he was told that a person had just called inquiring about the recovered Cadillac and complaining that his car had been stolen. After he was given Cole's name and address as that of the person who had inquired, Marshall together with Robertson and Detective Sigler went to Cole's apartment. While they were speaking to Cole through an open door, Marshall saw a white hat on or near a couch inside. In response to the officers' request, Cole gave them permission to en-

---

**2.** As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the underlying Bill of Rights provisions (which of course impose limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties).

**3.** Despite what has been said in n. 2, it is wholly inappropriate to call the Fifth Amendment into play as to a state court conviction. Where the Fourteenth Amendment provides its own direct guaranty of due process of law, there is simply no occasion for incorporating the identical guaranty from the Fifth Amendment.

**4.** Cole wanted to suppress the evidence resulting from the gunshot residue test and the police line-up.

ter the apartment. Marshall asked if Cole had any weapons in the house, and Cole told them that there were two guns under the bed in the bedroom. Marshall and Robertson retrieved the guns,[5] and Marshall told Cole that they were investigating a homicide and that Cole's Cadillac had been recovered near the site of the homicide. They asked Cole to accompany them to the police station, and Cole agreed.

Sigler was also a witness at the pretrial hearing. He too testified to seeing a white hat on a couch inside Cole's apartment as the officers stood at the open doorway. While Marshall and Robertson were in the bedroom retrieving the guns, Sigler stayed with Cole and learned that Cole was Matthews' boyfriend, that Matthews had spent the previous night with Cole, that Cole had seen Matthews and that she had been with him in his Cadillac on the day of the murder. Cole also told Sigler what Matthews was wearing that day (information that Sigler confirmed from having viewed her body after the shooting). Cole told the officers that someone had phoned him and told him that they knew where his Cadillac was located.

Sigler further testified that although Cole was never told he was under arrest while the officers were at his apartment, Sigler later prepared a report in which he stated the time and place of arrest as 3:20 p.m. in Cole's apartment. Even though Cole agreed to accompany the officers to the police station, Sigler testified that Cole was not free to leave at that time and would have been handcuffed and placed under arrest if he had refused to go to the station.

Cole testified during the pretrial hearing that he did not ask the officers into his apartment and that they did not show him any warrant, but he acknowledged that they did not use any force to enter. He admitted that the police arrived at his apartment in response to his own call to the police stating that he was the owner of the

Cadillac. Cole also testified that his cap was not on the couch but in his closet.

After hearing all the testimony, trial Judge William Cousins denied Cole's motion to quash his arrest and to suppress evidence. Judge Cousins did not reach a conclusion as to when Cole's arrest took place, choosing instead to deny Cole's motion based on a finding that probable cause existed when the police were at Cole's apartment (R. 85–86):

> This Court does find that the facts are not crystal clear as to whether or not the defendant was placed under arrest at the time that he was in the apartment.
>
> The defendant has testified that he was told. The officers have not so testified, however, it is the finding of this Court that officers going to an apartment after the shooting and a homicide, where the officers have information of a person who was involved in the shooting was the operator of a blue and white Seville, and that the person had a white hat, and where the officers determined that the person who was inquiring about the vehicle had indicated that he is the owner of the blue and white Seville, and that the person who was shot was his girlfriend, and he had been with that person that morning, and that—and where the officers had been advised that a person had a white hat—it has been noted that the defendant had a white hat, and that this is information that officers acting reasonably would do what these officers did and, accordingly, the Court finds that the motion to quash the arrest and suppress evidence is not well founded. The motion will be, respectfully, denied.

That probable cause finding was upheld on appeal. Although it stated that the time of arrest was not crucial to a resolution of the issue (170 Ill.App.3d at 920, 120 Ill.Dec. at 749, 524 N.E.2d at 931), the Appellate Court nevertheless decided that the arrest occurred "at the moment" when the police asked Cole to accompany them to the police station (*id.* at 921, 120 Ill.Dec. at 749, 524

---

**5.** At that time the officers knew that Matthews had been shot, but neither gun retrieved was in fact the murder weapon.

N.E.2d at 931). At that point Cole could not reasonably have believed he was free to leave, because the police had then advised him of the investigation of Matthews' homicide, had questioned him about when he had seen her and had asked him about and had retrieved weapons. That analysis was said to be buttressed by Sigler's suppression hearing testimony that Cole was not then free to leave.

After determining when the arrest occurred, the Appellate Court concluded that probable cause had existed for the arrest (*id.* at 921–24, 120 Ill.Dec. at 749–51, 524 N.E.2d at 931–33). In coming to that conclusion the court used not only the evidence adduced at the pretrial hearing but also some of the evidence adduced at trial—Russell's testimony, bolstered by the testimony of two other individuals, Valencia Davis ("Davis") and Jackie Lee ("Lee").[6] Russell had not testified at the pretrial hearing, and the officers at that hearing were not asked nor did they state what they had learned from Russell.

At the trial Davis testified that at approximately 12:15 p.m. on the day of the murder she was in her apartment, having just talked on the telephone to her friend Lee and having asked Lee to come pick her up. Shortly after Davis hung up she heard the sound of screeching tires. She looked out of her window and saw the Cadillac in the alley below. She saw a black man wearing a light-colored hat get out of the Cadillac, leave it running with the car door open and run to get into another car that had just arrived.

Just a few minutes later Lee and her brother Dwayne Clark ("Clark") arrived, and the three left Davis' apartment. Lee went over to the Cadillac, turned off the car, took the keys and removed a telephone bill from the glove compartment. Davis said that the three had devised a plan to call the person whose name appeared on the telephone bill to inform him of the location of the car, hoping to extract a reward.

Davis, Lee and Clark then picked up Russell and went to Lee's apartment, where Lee called the number on the phone bill. Raymond McPartlin, a representative of Illinois Bell Telephone, testified that a telephone call was placed from a number registered to Lee to a number registered to Cole at 12:49 p.m. on October 21, 1983 and that a nine-minute conversation then took place. Davis, Russell and Clark returned to Davis' apartment. Davis testified that she and Clark went to buy beer nearby and left Russell near the Cadillac. When Davis and Clark returned, they saw Russell driving the Cadillac and in the process of being arrested.

Lee also testified to the same events. She added that she remembered that Cole's name was on the phone bill taken from the Cadillac's glove compartment.

Russell testified that Lee, Davis and Clark picked him up at his apartment at approximately 12:30 p.m. On the way back to Lee's apartment they discussed with Russell their plan to extract a reward from the owner of the Cadillac. At Lee's apartment they decided that Russell, Davis and Clark would get the Cadillac and drive it back to Lee's apartment. Lee gave Russell the car keys, then Russell, Davis and Clark returned to the Cadillac and Russell was dropped off nearby. He approached the car cautiously, got in and began to drive away when he was arrested by the police at about 1:00 p.m.

---

6. It is important to note here that the Appellate Court could rely only upon the testimony of Russell for the determination of probable cause, because only his story could have been known to the police at the time of the arrest. Police did not talk to Davis or Lee until after Cole's arrest. Indeed, after having recited the Davis–Lee testimony next described in the text, the Appellate Court appeared to make it plain that such testimony was adverted to only as being cumulative to the significant facts testified to by Russell (*id.* at 924, 120 Ill.Dec. at 751, 524 N.E.2d at 933):

We consider the testimony of Dwayne Russell important for purposes of determining the existence of probable cause to arrest defendant because it indicates that, later that afternoon, when police, including Officer Marshall, investigated defendant's inquiry concerning the Cadillac, they were aware of Dwayne Russell's explanation for his presence in the automobile.

After recounting that testimony by Russell, the Appellate Court characterized as "most significant" Russell's having testified (over defense objection) that he spoke to police within 30 minutes of his arrest telling them what had happened (170 Ill. App.3d at 924, 120 Ill.Dec. at 751, 524 N.E.2d at 933).[7] Then, after its statement quoted in n. 6, the Appellate Court went on to state its conclusion (*id.*):

> In view of the totality of the above evidence we do not agree with defendant's contentions that sufficient probable cause did not exist to support arrest. Far from indicating that the police merely possessed knowledge consisting of the arrest of the probable offender, Dwayne Russell, and had only a general description of the wanted individual at the time they arrived at defendant's apartment, the record discloses the officers had reason to believe that Russell did not commit the murder, and were aware of considerable information connecting defendant to circumstances relating to the crime.

■ Cole objects to the use of that testimony to sustain a finding of probable cause, complaining that such use deprived him of a full and fair hearing on the issue. But that misperceives the lesson of *Stone v. Powell*, for it effectively invites this Court to act as a super-appellate court to review what the state courts (including the Illinois Appellate Court) have done. All that this Court is entitled to do under the mandate of *Stone v. Powell* is to assure:

1. that the state courts conducted a "hearing" in the meaningful sense, taking evidence and reaching factual conclusions based on that evidence, and

2. that in resolving the issues at that hearing the state courts applied the relevant constitutionally required standard of probable cause.

This Court must *not* determine independently whether it would or would not have made the same rulings on the evidence or would or would not have reached the same factual result (see, e.g., *United States v. Flannigan*, 884 F.2d 945, 951 n. 3 (7th Cir.1989)), or whether it would or would not have resolved the legal question of probable cause in the same way (see, e.g., *Dortch v. O'Leary*, 863 F.2d 1337, 1340–42 (7th Cir.1988)).

■ As Cole acknowledges, *United States v. Bolin*, 514 F.2d 554, 557 (7th Cir.1975) confirmed that it has long been settled doctrine—at least since *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)—"that the validity of a search or arrest can be supported by evidence which was adduced at trial even though it was not presented at the pretrial suppression hearing."[8] Here the Appellate Court not only addressed that issue in the course of its proper constitutional search for probable cause, but in doing so it cited both *Carroll* and *Bolin* as well as Illinois case law to the same effect (170 Ill.App.3d at 923, 120 Ill.Dec. at 750, 524 N.E.2d at 932). All those cases reflect a principle that is universally followed—and in the face of that overwhelming authority Cole can scarcely label the procedure itself as one lacking in "due process of law."

As it happens, the Appellate Court may well have applied that established case law incorrectly. It mistakenly said that Russell had testified at trial that he had related his version of the events to the police within 30 minutes of his arrest, while in fact he was not permitted so to testify because Judge Cousins sustained the defense objections to any testimony that would have disclosed just what Russell had told the police. But Judge Cousins at the *trial* court level had engaged in the identical search for probable cause without having made that same error, and *Stone v. Powell* really forecloses the granting of habeas relief for any such error anyway.[9]

---

7. Defense objections to questions about what Russell specifically told the police and whether it was what he testified to at trial were sustained. More on this subject later.

8. That principle has since been reconfirmed by our Court of Appeals in still another federal prosecution in *United States v. Longmire*, 761 F.2d 411, 418 (7th Cir.1985).

9. This just-concluded paragraph of the text has

■ In essence Cole had not one but two *opportunities* for full and fair litigation of his Fourth Amendment claim, one before the trial court and one before the Appellate Court (see *United States ex rel. Barksdale v. Sielaff*, 585 F.2d 288, 292–93 (7th Cir. 1978)). And it bears repeating that what *Stone v. Powell* mandates is such an "opportunity." What Cole is really asserting here is not the deprivation of that opportunity but rather a quarrel with the result that he obtained from the Illinois courts, something as to which our Court of Appeals has spoken in *United States ex rel. Maxey v. Morris*, 591 F.2d 386, 389 (7th Cir.1979) (footnote omitted):

> *Stone* thus establishes that state court constitutional holdings, at least in the context of Fourth Amendment questions involving the application of the exclusionary rule, are not subject to collateral review merely because the federal courts would decide the issue differently.

In sum, *Stone v. Powell* bars consideration of Cole's Fourth Amendment claim as a matter of law.

### Sixth and Fourteenth Amendments

■ Cole's other constitutional claims are grounded on his inability to call Detective Sigler as a witness at the trial. Because Sigler's unavailability was the result of the prosecutor having released Sigler (whom the defense had subpoenaed for trial) as a witness without having informed the defense that Sigler would be unavailable, Cole claims a denial of his Fourteenth Amendment right to due process and his Sixth Amendment rights to compulsory process and to confront witnesses.

Cole says that the defense had subpoenaed Sigler a total of three times, the second and third subpoenas being served through Sigler's superiors at the Chicago Police Department. Sigler never appeared, and Cole's lawyer made repeated efforts throughout the trial to locate Sigler. In addition, defense counsel told the judge that he was having problems locating Sigler and the judge asked the prosecutor to assist in that effort. Finally, with the trial ending and Sigler still unavailable, the defense entered into a stipulation with the prosecution as to the substance of Sigler's testimony.

On Cole's post-trial motion for a new trial, Detective Sigler testified that he had been subpoenaed by the defense on August 9, 1985 to testify at the trial on August 13. On August 13 Sigler went to the office of the State's Attorney, in accordance with Chicago Police Department procedure. Sigler remained in the office the entire day but was not called to testify. At that time he told Thomas Epach ("Epach"), the Assistant State's Attorney assigned to the case, that he was to begin a two-week furlough on August 15. Neither Epach nor Sigler told defense counsel or the court that Sigler would be on furlough through the end of August. Sigler was never personally served with a second subpoena while he was on furlough.

Cole argues that he suffered prejudice as a result of the prosecutor's misconduct[10]

really given Cole more than his due, because he has never advanced a claim based on any mistakes in how the Appellate Court went about its business once it decided to take trial testimony into account in reviewing the probable cause issue, or based on any mistaken result allegedly reached by the Appellate Court in doing so. Instead the claim is the already-identified one of the Appellate Court's use of trial testimony as such, rather than its considering only the evidence adduced at the probable cause hearing itself. This opinion has addressed the added issue in the text only to avert any possible future claim (however remote) that Cole's present counsel, by failing to raise that issue, might be argued to have waived it and thereby to have provided Cole with inadequate representation.

10. Because Cole cannot overcome the hurdle of demonstrating prejudice in the constitutional sense (the issue discussed hereafter in the text), this opinion need not resolve the question whether the prosecutor's conduct rises to the level of "misconduct" in constitutional terms. It is nonetheless worth noting what the Appellate Court said on that score (170 Ill.App.3d at 933, 120 Ill.Dec. at 757, 524 N.E.2d at 939):

> [W]e cannot condone the apparent established Chicago police department procedure which directed Sigler to the office of the State's Attorney on the day he was subpoenaed by the defense to appear at trial, and the apparent failure of the assistant State's Attorney to extend professional courtesy to defense counsel with notification of Sigler's scheduled absence. . . .

and that the following stipulation did not cure that prejudice:

> Mr. Peters (the defense attorney): Ladies and gentlemen, at this time there will be another stipulation. The stipulation is as follows:
>
> That on October 21, 1983, Detective Henry Sigler was a Chicago Police Officer; that he had a short interview with a Linda Eichelberger and at that time she did not describe the offender by height or weight and she did not describe a white hat.
>
> Mr. Epach (assistant state's attorney): So stipulated.

Epach refused to stipulate further that Sigler would testify (a) that Eichelberger had told him that she had not seen the offender's face and (b) that Stovall told Sigler the day after the shooting that the offender was 5′8″ tall, weighed 140 pounds and had Jeri curls, a description that did not fit Cole.[11] For the purposes of this opinion, this Court will accept Cole's premise that Sigler would have so testified.[12]

To prevail on his due process claim, Cole must establish that an "absence of ... fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial" (*United States v. Valenzuela–Bernal,* 458 U.S. 858, 872, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193 (1982), quoting *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 289–90, 86 L.Ed. 166 (1941)). As for a claimed violation of the Sixth Amendment right to compulsory process for obtaining witnesses in the defendant's favor, the test is whether the testimony "would have been *relevant* and *material,* and ... *vital* to the defense" (*id.* 458 U.S. at 867, 102 S.Ct. at 3446, quoting and adding emphasis to *Washington v. Texas,* 388 U.S. 14, 16, 87 S.Ct. 1920, 1921–22, 18 L.Ed.2d 1019 (1967)). Of course impeachment evidence may very well be

"relevant and material" (*United States ex rel. Ashford v. Director, Illinois Department of Corrections,* 871 F.2d 680, 687 (7th Cir.1989)), and it may be "vital to the defense" if the evidence is exculpatory (*id.*). Implicit in the materiality requirement "is a concern that the suppressed evidence might have affected the outcome of the trial" (*Valenzuela,* 458 U.S. at 868, 102 S.Ct. at 3447, quoting *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2397–98, 49 L.Ed.2d 342 (1976); *Sharlow v. Israel,* 767 F.2d 373, 378 (7th Cir.1985)). Finally, a denial of the Sixth Amendment right to confront witnesses occurs when the defendant is precluded from effectively cross-examining a witness, which preclusion can include the barring of impeachment evidence (*Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974)).

None of that formidable battery of cases needs to be addressed in this instance. It is ultimately irrelevant whether the loss of Sigler's live testimony might rise to the level of constitutional error, for even were that the case those errors were harmless beyond a reasonable doubt (*Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)). For that purpose:

1. As to the Sixth Amendment right to confrontation for harmless error, "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt" (*Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986)).

2. As to the Sixth Amendment right of compulsory process, the same analysis is made, except that the corresponding assumption is that the excluded testimo-

---

**11.** Cole states that he was 5′11″ and 190 pounds and did not have Jeri curls at the time of the arrest.

**12.** This too gives Cole far more than the benefit of any doubt, because his post-trial motion was based only upon Sigler's potential impeachment of Eichelberger and not that of Stovall. Once

again Cole may have waived the opportunity to challenge the loss of Sigler's impeachment of Stovall. Because it turns out that such testimony would have been insignificant in any case and also for the same reason as stated in n. 9, this Court is making the pro-Cole assumption stated in the text.

ny had come in (*Ashford*, 871 F.2d at 688).

3. As for the Fourteenth Amendment claim, if the error is found to be harmless beyond a reasonable doubt then by definition it does not rise to the level of a due process violation "because the *Chapman* harmless-error standard is more demanding than the 'fundamental fairness' inquiry of the Due Process Clause" (*Greer v. Miller*, 483 U.S. 756, 765 n. 7, 107 S.Ct. 3102, 3109 n. 7, 97 L.Ed.2d 618 (1987)).

In determining whether error was harmless, our Court of Appeals has often spoken in terms of whether the evidence supporting the conviction was "overwhelming" (*Hunter v. Clark*, 906 F.2d 302, 309 (7th Cir.1990)), but it has also found constitutional errors harmless "even in the absence of 'overwhelming' evidence, focusing instead on the 'impact of the objectionable material on the jury's verdict' as a means to determine whether 'the jury would have convicted [the defendant] absent [the constitutional error]' " (*id.*, citing *Fencl v. Abrahamson*, 841 F.2d 760, 769 (7th Cir. 1988)). In terms of either the "overwhelming" label or the "impact" framework, any error in this case is indeed harmless.

If Sigler had in fact testified that Eichelberger told him that she had not seen the offender's face, the jurors might of course have discounted Eichelberger's identification entirely. Any incremental effect in that respect, however, is problematic at best: After all, it might well be that the jurors had already discounted Eichelberger's testimony based upon the more limited impeachment provided by the stipulation to which the prosecutor *did* agree. And even without Sigler's testimony, Cole had the full opportunity to cross-examine Eichelberger herself and to confront her on cross-examination with her asserted statement to the police that she had not seen the offender's face.[13]

As for the next assumption—that Sigler's testimony would also have impeached Stovall's testimony—the impact of *that* impeachment would have been minimal, for Stovall had already been impeached with substantially comparable testimony by Detective Salvatore. Salvatore testified that Stovall described the suspect as 5'7", 135 pounds and curly-haired, a description highly similar to the one to which Sigler would have testified. Although hearing the same impeachment twice might perhaps have increased the weight of that evidence in the minds of the jurors, they would have gained no new knowledge from Sigler's testimony.

Furthermore, the remaining evidence of Cole's guilt was extremely strong. That evidence has more than one significant component.

First, the testimony of two other eyewitnesses would have been left wholly untouched by Sigler's testimony. Johnson was in the same car as Eichelberger, and she provided corroborative testimony linking the offender to the Cadillac and a white or light-colored cap. Though that testimony alone was only circumstantial, far more importantly Morgan also testified to the same events and had seen Cole and his Cadillac on earlier occasions at the Amoco station—and *she* both identified Cole in a police line-up the next day and made a courtroom identification of him as the driver and of his hat as the one she saw on the fatal day. And finally, although Stovall's testimony may have been subject to discounting (as neither Johnson's nor Morgan's was) because of his earlier criminal conviction and his statements to Detectives Sigler and Salvatore giving a description that did not match Cole's appearance, that would seem to have left untouched one aspect of Stovall's evidence that tied Cole directly to the murder—his specific identification of Cole through a police lineup.[14]

---

**13.** It should also be noted—something not addressed by Cole at all—that there appears to have been nothing to prevent the defense from calling Sigler's partner Mark Morrisey, who was *not* on furlough at the time and to whom Eichel-

berger had made her impeaching statements as well.

**14.** This last aspect is puzzling. Even though Salvatore testified and Sigler presumably would have testified to Stovall's having given a description on the day of the murder that did not fit

Second, the objective evidence as to the car and the hat—albeit circumstantial—was strongly corroborative. As for the Cadillac, it had been contemporaneously described, it belonged to Cole, and the evidence conclusively explained away Russell's involvement—it was unquestionably unrelated to the murder. And as for the hat, its tie-in to Cole added just another nail to the already tightly-sealed coffin of evidence against him.

It is unnecessary to repeat chapter and verse of the incriminatory evidence recited in the course of this opinion. Even with the limited discount represented by any assumed constitutional errors, the evidence to prove Cole was the murderer swamps the scanty (and for the most part suspect) potentially exculpatory evidence heard by the jury.[15] In light of the limited impact of the excluded testimony and the strong evidence of Cole's guilt, this Court finds that any possible constitutional errors involved in the exclusion of Detective Sigler's testimony were harmless beyond a reasonable doubt.

*Conclusion*

As called for by Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court determines that no evidentiary hearing is required here. Moreover, there is no genuine issue of material fact. Based on the transcript and record of state court proceedings, it is clear that Cole's Fourth Amendment claim is barred by *Stone v. Powell,* and his claims of Sixth and Fourteenth Amendment violations are overridden by the determination that any claimed errors were harmless beyond a reasonable doubt. As a matter of law, Respondents' summary judgment motion is granted and Cole's Sec-

tion 2254 Petition for a writ of habeas corpus is dismissed.

Matthews, the fact remains that Stovall picked Matthews as the killer out of a police lineup conducted on the *very next day.*

**15.** Only Glenn was a disinterested witness whose eyewitness testimony might aid Cole, and her testimony (essentially that of *non*identification) pales beside the strong and certain positive identification provided by Morgan, who was totally disinterested and had all the traditional

indicia of reliability of identification. Though this Court should not be misunderstood as making a closing argument for the prosecution, it would certainly seem likely that a jury would not be impressed by the powers of observation of someone who (among other aspects of her inability to identify) recalled the car as "dark-colored, either black or navy blue" when it was unquestionably a blue and white Cadillac.